**STATE of Missouri, Respondent,**

v.

**Jerry SANNER, Appellant.**

**No. 12755.**

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 8, 1983.

870

Roger Wall, Public Defender, Judicial Circuit 44, Ava, for appellant.

John Ashcroft, Atty. Gen., Neil MacFarlane, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found appellant ("Sanner") guilty of murder in the second degree,[1] § 565.004, RSMo 1978, and assessed punishment at 10 years' imprisonment, § 565.008.2, RSMo 1978. The trial court imposed that sentence.

Sanner complains about the admission of certain physical evidence and self-incriminating statements at his trial, about the trial court's rulings on sundry other issues, and about the verdict directing instruction.

The evidence, viewed most favorably to the verdict, with all contrary evidence and inferences disregarded, *State v. Jackson*, 643 S.W.2d 74, 78[10] (Mo.App.1982), shows that about 11:27 p.m., March 3, 1981, the

dispatcher at the Christian County sheriff's office received a telephone call from a person who identified himself as Tom Kimmons. The caller said he had been shot in the neck and needed help, and that the person who shot him was in a "gold-colored vehicle." The caller said he was at the farm of his father, George Kimmons.

The Kimmons farm is southwest of Ozark in Christian County,[2] between three and four miles west of highway 65, just off highway F.

The dispatcher "set the pagers off" for an ambulance, telephoned Sheriff L.E. "Buff" Lamb, and telephoned Deputy Sheriff Orvil Danderson. Lamb and Danderson started to the farm in separate vehicles.

Deputy Sheriff Al Lynn heard the ambulance call on the "scanner" at his home. Lynn and his wife, an ambulance attendant, also started to the farm, using Lynn's pickup.

Lamb reached the farm first, and found Tom Kimmons dead in the kitchen. Lamb radioed Lynn, still en route, and directed Lynn to "set up a road block" and "stop any gold-colored car that come through."

Lynn positioned his pickup west of highway 65, facing south on highway F, 3.4 miles from the farm. About four minutes later, Lynn saw a gold 1971 Chevelle coming from the direction of the farm. The Chevelle went past Lynn and headed east on highway F toward 65. Lynn "pulled in behind it," turning on a "red light" in the windshield of his pickup.

At highway 65, the Chevelle turned north toward Ozark. Lynn followed, at speeds between 60 and 65 miles per hour. He saw three "subjects" in the Chevelle, and radioed this information to the dispatcher. Reaching Ozark, the Chevelle turned east on highway 14 and stopped in front of the Fasco factory, ending a chase of some 1.6 miles.

---

1. Sanner was initially charged with capital murder, § 565.001, RSMo 1978, but the prosecuting attorney amended the information to murder in the second degree just before trial.

Rule 23.08, Missouri Rules of Criminal Procedure.

2. The cause was tried in Wright County on a change of venue.

Meanwhile, Danderson had reached the farm and learned from Lamb that Tom Kimmons was dead, having apparently been shot by a shotgun. Overhearing the radio dispatch about Lynn's pursuit of the Chevelle, Danderson headed for Ozark.

When the Chevelle stopped, Sanner, the driver, exited, and started toward Lynn's pickup. Lynn got out and searched Sanner, finding no weapon. Lynn instructed his wife to guard Sanner, then went to the Chevelle. It was occupied by Ronald Edward Crank and Douglas Ray Coder.

The driver's door was open and the dome light was on. Using his flashlight, Lynn looked inside the Chevelle and saw an empty brown holster "for a fairly short-barrelled gun" between the seat and the console. Lynn ordered Crank and Coder out, and gave them a "pat-down search."

At this point, an officer of the Ozark Police Department arrived. The officer had learned from radio messages that a shooting had occurred at the Kimmons farm, that a gold-colored vehicle was "supposedly involved," that Lynn had been following the vehicle north on highway 65, and that the vehicle had turned onto highway 14 at Ozark. The officer asked Lynn if the trio had been arrested. Lynn answered, "[N]o," then added "[L]et's research (sic) them and then you arrest them."

Sanner, Crank and Coder were searched more thoroughly, then the Ozark officer arrested them for "felonious assault," and read them the "*Miranda* Warning." [3]

Other officers soon arrived, including Danderson. He looked in the Chevelle, saw the holster, and also saw some shotgun shells in the console. Danderson read Sanner the *Miranda* warning, and asked if Sanner understood it, receiving an "affirmative response." Danderson told Sanner he was being held for investigation of homicide.

Sanner, Crank and Coder were jailed. The Chevelle, which belonged to Coder, was impounded.

About 12:30 a.m. March 4, the supervisor of criminal investigations for the Missouri State Highway Patrol in southwest Missouri arrived at the Kimmons farm, at Lamb's request. He saw a pool of blood inside the front door and "pellet marks" on the ceiling and "back wall." Drops of blood led to the kitchen, where the body lay near a telephone. The supervisor saw blood on the phone and found a "copper jacket" from a lead slug from a large caliber revolver "sticking" in the shirt on the body. He found another copper jacket on the kitchen floor.

A kitchen window, and the outside screen over it, had two holes caused by gunshots "from the outside in." Another window, near the phone, had a bullet hole "from the inside out." The supervisor concluded this latter hole was caused by one of the two bullets that entered through the other window.

The supervisor removed some shotgun pellets from the front room ceiling, wall and floor, and picked up a piece of "wadding" from a .410 gauge shotgun off the floor.

At 7:50 a.m. March 4, Danderson obtained a search warrant for the Chevelle from a judge of the Circuit Court of Christian County. Danderson explained he did so as a "backup procedure," believing the Chevelle subject to search without warrant. He searched the Chevelle, labeling his action an "inventory search." [4] He found a .38 caliber revolver under the right passenger seat, a .410 gauge shotgun under the right side of the back seat, and a wallet on the passenger side of the "floorboard," partially covered by a floor mat. He removed all these items, along with the holster he

---

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. See *State v. Valentine,* 584 S.W.2d 92, 98[15] (Mo. banc 1979), and *State v. Gibeson,* 614 S.W.2d 14 (Mo.App.1981). Danderson said he did not search the Chevelle at the arrest scene

because he was looking for an escaped convict that night, who was later found and shot by another officer. Additionally, it was dark and he would not have inventoried the Chevelle on the roadside. Lynn recalled it was "drizzling rain."

had seen when the trio was arrested. The revolver contained five "spent" cartridges.

An autopsy on the body of Tom Kimmons the morning of March 4 revealed a shotgun wound on the "left side of the neck, posterior lateral," beginning at approximately "the muscle that allows you to turn your head." There was "stippling, or powder burn, tattooing," on the left side of the face and neck, indicating that a "multi-pellet weapon" had been fired at a range of less than 10 feet. A bullet wound was found on the left side of the back, at the approximate level of the seventh rib. That bullet passed through the superficial portion of the pulmonary vein and "nicked" the aorta. Approximately two quarts of blood were found in the chest, a "massive hemorrhage." There were three bullet wounds in the head. The pathologist removed three lead fragments and three copper jackets from the head, and a lead fragment from the upper part of the body, "closer to the back." According to the pathologist, death resulted from the hemorrhage in the chest. Had that not caused death, the "massive destruction of the brain, caused by the three gunshot wounds, would have completed it." In the pathologist's opinion, the head wounds were the last inflicted. He fixed the time of death between 10:00 p.m. and midnight, March 3.

The director of the regional crime laboratory in Springfield microscopically compared the three copper jackets removed from Tom Kimmons' body by the pathologist with the jackets of three bullets "test-fired" by the director from the .38 caliber revolver Danderson found in the Chevelle. Markings on two of the jackets from the body and markings on the jackets of the bullets fired by the director were "consistent with common origin." The director did not examine the lead fragments the pathologist removed from the body because they had been "protected" by the jackets, and had no "transfer" marks.

Around "11 o'clock or so" on the morning of either March 4 or 5, Lamb talked with Sanner in Lamb's office.[5] Before trial, Sanner moved to suppress what he said to Lamb on the grounds that his arrest was without probable cause and therefore improper, that he was not advised of his *Miranda* rights [6] and that his statements were made "without assistance of counsel." The trial court held an evidentiary hearing, *State v. Gantt,* 644 S.W.2d 656, 660[8] (Mo. App.1982), at which Lamb and Sanner presented conflicting testimony. After hearing that testimony, and other witnesses, the trial court denied the motion, making no formal findings of fact or conclusions of law, none being required. *State v. Brydon,* 626 S.W.2d 443, 448[1] (Mo.App.1981). Denial of the motion is one of Sanner's assignments of error.

Where the evidence conflicts as to the voluntary nature of a confession, the trial court has the responsibility to weigh the evidence and judge the credibility of witnesses. The burden is on the State to prove by a preponderance of the evidence that the confession is voluntary. If the evidence is sufficient to sustain the trial court's ruling, according deference to the judgment of the trial court on the credibility of witnesses, the result must be upheld on appeal unless manifest error has been committed. *State v. Helm,* 624 S.W.2d 513, 515[1–3] (Mo.App.1981).

From the evidence he heard, the trial court could have reasonably found that on the morning the conversation occurred, Sanner, Crank and Coder sent Lamb word by a jail trusty that they wanted to talk to him. Lamb went to their cells and told all three he could not talk to them. Later, "somewheres close to noon," a deputy sheriff brought Sanner from his cell to Lamb's office for a phone call. Lamb was holding $80 which someone had "dropped"; Lamb was trying to find out who. According to Lamb, Sanner said, "I need to talk to you."

5. Testifying at a pretrial hearing, Lamb fixed the date of the conversation as March 4. In his trial testimony, Lamb said he was "almost sure" the date was March 5.

6. Footnote 3, supra.

Lamb asked Sanner if his rights had been read to him, and Sanner replied, "[Y]es."

Lamb told Sanner that he (Lamb) had been advised not to talk to Sanner, and that Sanner "needed permission from his lawyer" before talking to Lamb.

Lamb quoted Sanner as responding, "I don't want permission."

Lamb said he was looking for some papers, money and a billfold.

According to Lamb, Sanner said, "[W]hich papers are you looking for?"

Lamb responded by asking Sanner, "[I]s this your money?"

Sanner replied, "[N]o," then told Lamb there were some papers in his (Sanner's) coat pocket. Lamb asked Sanner where his coat was, and Sanner answered, "[T]he deputies hung it up."

Lamb and Sanner walked to a room where 10 to 12 coats were hanging. Lamb asked Sanner which coat was his, and Sanner pointed it out. Lamb took Sanner's coat off the nail it hung on, and handed the coat to Sanner. Sanner removed some papers from the coat and handed them to Lamb. The papers "belonged to Tom Kimmons," and included his driver's license.[7]

Sanner told Lamb he (Sanner) was driving the car, and Coder handed him the papers over the back of the seat, telling him to put them in his coat pocket.

Sanner then related that Tom Kimmons had offered Coder and Sanner $3,500 to kill Kimmons' ex-wife, because Kimmons was going to have to start paying her "a large amount of child support." This offer was made at the Kimmons farm. Sanner told Lamb that Kimmons gave Coder and Sanner some guns "to do the job with." Sanner said he and Coder went to Springfield, but they "couldn't do it," so they went back and told Tom Kimmons they could not kill a woman. Kimmons instructed them that if they did not kill her, to "go get her and bring her down there to his farm and he'd take care of it." Sanner told Lamb that he

and Coder went back to the house in Springfield, and "come back and told him [Tom Kimmons] they could not do it, and Tom Kimmons told them if they didn't do it, that he was going to get somebody to kill them." Sanner explained that he, Coder and Crank went to the Kimmons farm March 3 "to get the guns down there to Tom and try to get it all called off." Lamb quoted Sanner as saying that Coder was driving when the trio reached the Kimmons farm, and that Coder drove past, turned around, and drove past again. Coder then stopped, and "got on the right-hand side with the shotgun." Sanner drove to the Kimmons house, and Coder shot Tom Kimmons.

In arguing that the trial court erred in denying the motion to suppress, Sanner begins with the premise that his arrest was "illegal" in that he was arrested without warrant "on less than sufficient probable cause," and therefore his statements to Lamb were "tainted." Sanner's brief does not say how the State failed to establish probable cause; however, at the pretrial hearing Sanner tried to show that at the time of his arrest, the Ozark police officer who arrested him was not personally aware of each detail known collectively by the investigating officers.

█ It is unnecessary that the facts and circumstances comprising probable cause be within the knowledge of the arresting officers at the moment of arrest. Probable cause is to be determined upon the objective facts available for consideration by the agencies or officers participating in the arrest; otherwise each individual officer would have to be fully briefed or informed of all of the essential factors in each case before proceeding to make an arrest upon probable cause. *United States v. Stratton,* 453 F.2d 36, 37 (8th Cir.1972). In the operation of an investigative or police agency, the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause; the arresting officer himself need not possess all of the

---

7. In his motion to suppress, Sanner also sought to prohibit the State from using "any physical

evidence seized as a direct result" of what he told Lamb. These papers fit that description.

available information. *Id.; State v. Pruitt,* 479 S.W.2d 785, 788 (Mo. banc 1972).

 Missouri has adopted the definition of probable cause for a warrantless arrest set forth in `Brinegar v. United States,` 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Probable cause to arrest exists when the facts and circumstances within the knowledge of the officers, and of which they have reasonably trustworthy information, are sufficient to warrant a belief by a person of reasonable caution that the person to be arrested has committed the crime for which he is being arrested. *State v. Reynolds,* 619 S.W.2d 741, 746 (Mo.1981). In the determination whether there was probable cause to make an arrest, the courts must exercise a subjective judgment, and such determination depends upon the particular facts and circumstances of the case under consideration. *Id.*

 Here, when the Ozark police officer made the arrests, the investigating officers knew, collectively, that a person identifying himself as Tom Kimmons had reported by phone about 11:27 p.m. that he had been shot in the neck at the Kimmons farm and that the person who shot him was in a gold-colored vehicle, that shortly thereafter Tom Kimmons was found dead at the Kimmons farm, having apparently been shot by a shotgun, that the Kimmons farm is southwest of Ozark in an unincorporated area of Christian County, off highway F between three and four miles west of highway 65, that minutes after the body was found, a gold-colored Chevelle was seen on highway F, 3.4 miles from the Kimmons farm heading away from the farm, and that the Chevelle was pursued some 1.6 miles by a deputy sheriff flashing a "red light," at speeds exceeding the lawful limit,[8] before stopping. These circumstances, coupled with the absence of evidence of any other vehicles seen coming from the direction of the Kimmons farm, establish probable cause for the arrests. We therefore reject Sanner's contention that his arrest was "illegal." The arrest being lawful, two of the cases on which Sanner relies, *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), are inapplicable.

Sanner makes a second argument for the suppression of his statements to Lamb, asserting he was questioned in the absence of his attorney, thus rendering his statements inadmissible under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *Edwards* holds that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *Edwards,* 451 U.S. at 484, 101 S.Ct. at 1884. *Edwards* further holds that an accused who expresses his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police. *Id.*

 Here, Sanner twice initiated communication with Lamb, first through the trusty and second in person. Lamb rejected the first, and acceded to the second only after ascertaining that Sanner had been advised of his rights and cautioning Sanner to get permission from his lawyer,[9] which Sanner eschewed.

*Edwards* recognizes that law enforcement officers are not prohibited from listening to voluntary statements of an accused and using them against him at trial, 451 U.S. at 485, 101 S.Ct. at 1885, and that frequently in a meeting initiated by the accused, it is likely that an officer will say or do something that is clearly "interrogation," *id.* at

---

**8.** We take judicial notice, § 490.080, RSMo 1978, that on March 3, 1981, the maximum lawful speed on highway 65 where the pursuit occurred was 55 miles per hour. § 304.009.1, RSMo 1978, as amended by Laws 1979, p. 487.

**9.** Sanner testified he had his wife and mother hire a lawyer of his choice to represent him.

486, footnote 9, 101 S.Ct. at 1885, footnote 9. In that event, the question is whether a valid waiver of the right to counsel and the right to silence has occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue. *Id.; State v. Gibson,* 623 S.W.2d 93, 97 (Mo.App.1981).

Sanner not only opened the dialogue, he asked Lamb what papers Lamb was looking for, then told Lamb of the papers in the coat. Lamb's inquiry about the location of the coat was a predictable response. Sanner unhesitatingly pointed out the coat, removed the papers and handed them to Lamb. Sanner's narrative thereafter came without interrogation.

The evidence supports a finding that under the totality of the circumstances, Sanner knowingly and intelligently elected to tell Lamb what he did, and to turn over the papers, without counsel being present. The trial court did not err in denying the motion to suppress the papers and Sanner's statements to Lamb. *Oregon v. Bradshaw,* —— U.S. ——, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

Crank, testifying for the State pursuant to a "deal,"[10] explained that he and Coder lived together at Sparta for approximately three months immediately preceding the shooting. Crank first saw the .410 shotgun in January, 1981, discovering it in a plumbing chute in the bathroom of the house they occupied.

Crank testified that on the evening of March 3, 1981, he was at Sanner's home drinking beer and wine with Sanner, and Sanner said "we" are going to "knock off" Tom Kimmons. Crank quoted Sanner as saying Kimmons had threatened him (Sanner). Crank attempted to dissuade Sanner, then dropped the subject.

Later, they went to Crank's house, finding Coder there with his "girlfriend" and other people. According to Crank, Sanner and Coder said they were going to take the shotgun back to Tom Kimmons. Coder and his girlfriend left in Coder's gold 1971 Chevelle, and Crank and Sanner left in Sanner's pickup, Crank bringing the shotgun.

Reaching Ozark, Crank and Sanner met Coder, no longer accompanied by his girlfriend. The trio left Ozark in Coder's Chevelle, Coder driving. Crank quoted Coder as saying that Tom Kimmons had pushed him too far, and that he (Coder) was going to kill Kimmons. According to Crank, Sanner said he would do it, but he wanted to be able to face George Kimmons, "you know, like he could talk to George and not be a suspect after it was over."

Crank recalled that when they reached the house, Coder drove past and turned around, then Sanner took the wheel and drove back to the house, stopping in a driveway near a garage. Coder got out holding the shotgun, and handed Crank a pistol that Crank had never seen before. Crank quoted Coder as saying, "[I]f anybody else is in the house, I want you to kill them."

Crank saw Coder walk to the house and knock, then a light went on. Coder disappeared, then Crank heard a shot and "a guy in the house screaming." Crank said, "Jerry, let's get out of here."

Sanner "started the car up," and Coder "come running out to the car." Coder "jumped in" and Crank said, "Ray, let's get out of here."

According to Crank, Coder said, "[N]o, he seen me."

Crank asked Coder if he "killed the guy," and Coder said he shot him in the face and chest. Coder "hollered" at Crank for the pistol.

Crank testified he gave Coder the pistol, and Coder "run around the back of the house." Crank heard a "couple" of shots, then saw Coder run to the front door and

---

**10.** Crank testified the "deal" was that murder charges against him would be dismissed, he would plead guilty to "conspiracy to commit assault," the State would recommend a 10-year sentence, and further recommend that execution thereof be suspended and that Crank be placed on probation for five years.

enter the house. Crank then heard a third shot.

Crank started toward the house to get Coder, hearing another shot on the way. Crank entered the front door, heard a fifth shot, and saw some blood on the floor. Crank saw Tom Kimmons "laying on the floor," and Coder "standing over the top of him with the gun." Coder told Crank to "check the cabinets." Crank recalled Coder saying, "Jerry said there was some money in the cabinet."

Crank testified Coder handed him the gun, then ran to the bedroom and began "fumbling through the closets." Crank and Coder then returned to the Chevelle and started back to Ozark on highway F, Sanner driving.

Crank recalled Sanner saying he would have "did it, but he wanted to be able to face George, and something about a polygraph test, and he said it would be pretty easy living from then on." According to Crank, Sanner also said, "I want you guys to get rid of the guns. I want you to dispose of them, cut them up, and let's get rid of them."

Crank also remembered Sanner asking if they had found any money. Crank saw Coder hand Sanner some "papers."

When Crank saw Lynn's red light, Crank said, "[L]et's pull over." Coder, according to Crank, responded "[S]tep on it."

After the trio was jailed, Crank recalled being told by Sanner, "[W]e didn't know nothing about it. You stayed in the car, and Ray had to kill him."

An employee of an Ozark bank testified Tom Kimmons cashed a "C.D." February 20, 1981, receiving $3,457.06 cash. At Kimmons' request, the bank employee placed the cash in an envelope in the vault. On March 3, Kimmons returned to the bank and picked up the cash.

When Lamb examined Tom Kimmons' body at the scene of the shooting, Kimmons' pockets were empty, and Lamb found no billfold.

Sanner alleges the trial court erred in denying his motion to suppress the items Danderson removed from the Chevelle March 4. The point, as stated in Sanner's brief, asserts the search warrant was "issued and based upon a faulty affidavit," and was issued "without probable cause." The point does not state wherein and why the trial court's ruling is claimed to be erroneous, a violation of Rule 30.06(d).[11] The argument portion of Sanner's brief is similarly vague, stating only that the affidavits do not state facts sufficient to support probable cause, do not articulate the underlying basis for the conclusions they contain, and have plain misstatements and errors. No specific insufficiency, misstatement or error is identified. The only language approximating a specific allegation of error is a phrase in the argument portion that the affidavits do not indicate from whom the affiants received "the facts," when they received them, or the date of the crime.

■ A point relied on should be sufficient in itself, and the argument made thereto should be so clear that an appellate court is not required to seek through the transcript or other portions of the record to discover the meaning of either the point or the argument. *State v. Ritterbach,* 627 S.W.2d 894, 897[5] (Mo.App.1982).

■ We have, nonetheless, searched the record in an effort to assess the worth, if any, of Sanner's contention. The affidavits are not there.[12] Had they been supplied, it is possible we could have ruled the point on the merits. We cannot do so without the affidavits.

11. Rule references are to Missouri Rules of Criminal Procedure. The defect appears in Sanner's "corrected" brief. The same defect appeared in Sanner's original brief, and was called to his attention by our order per Rule 30.09, which allowed Sanner to file the later brief.

12. The State pointed this out in its brief four months before the cause was submitted. Despite the warning, Sanner failed to supplement the legal file by adding the affidavits, and offered no explanation for their absence.

■ The duty falls upon the appellant to file the transcript in the appellate court and to ensure the inclusion of all the evidence and proceedings necessary for a determination of the questions presented by the appeal. *State v. Gordon,* 527 S.W.2d 6, 10[5] (Mo.App.1975). Sanner ignored that duty. The breach of Rule 30.06(d), coupled with the absence of the affidavits, forecloses Sanner's complaint about the receipt in evidence of the items Danderson removed from the Chevelle.

■ Sanner assigns error in the trial court's denial of his motion to bar the testimony of three witnesses: Lamb, Crank, and a special agent of the Bureau of Alcohol, Tobacco and Firearms, United States Treasury Department, the latter being called by the State in rebuttal. Sanner asserts their testimony should have been excluded because "proper disclosure was not made as required by law and that the appellant was thereby prejudiced." This point, like the preceding one, fails to comply with Rule 30.06(d),[13] and the argument portion of the brief is no aid. Neither the point itself, nor the argument, cites anything that any of the three witnesses testified about that was not disclosed.

The transcript reveals that Lamb prepared a five page report July 16, 1981,[14] containing "in excess of fifteen or twenty places" where Lamb quoted what Sanner had told him. This report was furnished to Sanner's attorney.

The transcript further shows that Crank made a written statement March 4, 1981, at the sheriff's office, and another one May 28, 1981, in the presence of the prosecuting attorney and Crank's attorney. Both of these statements were furnished to Sanner's attorney. Additionally, Sanner's attorney took Crank's deposition September 29, 1981.

■ Neither Lamb's report, nor Crank's statements or deposition, has been produced for our examination, thus we are unable to see what was disclosed, or whether Lamb or Crank testified to anything that was not disclosed. Even if, however, we were to assume—which we do not—that the State failed to disclose something regarding Lamb or Crank, Sanner's complaint would still be unavailing unless he demonstrated that the trial court's refusal to exclude the testimony of Lamb and Crank resulted in fundamental unfairness. *State v. Royal,* 610 S.W.2d 946, 951[12] (Mo. banc 1981). Sanner has made no effort to do so. There is no hint in his brief as to how he was prejudiced. We cannot, therefore, convict the trial court of error in denying Sanner's request to exclude the testimony of Lamb and Crank.

■ Regarding the special agent, we first observe that, being a rebuttal witness, he was not required to be endorsed on the information. *State v. Miner,* 639 S.W.2d 569, 571[1] (Mo.1982). Rebuttal witnesses should, nonetheless, be disclosed. *State v. Tyler,* 622 S.W.2d 379, 385[16] (Mo.App. 1981). In that respect, the transcript contains a comment by Sanner's attorney that the special agent's name appears in a report pertaining to a statement made by Crank, and it appears that Sanner's attorney saw the report before trial.

When Sanner objected to the special agent being called to testify, the assistant attorney general who was aiding the prosecuting attorney informed the trial court that after the hearing on Sanner's motion to suppress Sanner's statements to Lamb, Lamb mentioned that there were "people walking in and out" on the day Sanner made those statements. Lamb told the assistant attorney general that he (Lamb) was going to contact some of those people "to see if they heard anything." Thereafter, while the trial was in progress, Lamb told the assistant attorney general about the special agent.

The State called the special agent to rebut certain testimony given by Sanner during his case-in-chief. Sanner testified, *inter alia,* that (a) it was not his idea to go to the

---

**13.** This was also called to Sanner's attention by our order per Rule 30.09, footnote 11, supra.

**14.** Trial occurred October 5 to 7, 1981.

Kimmons farm March 3, (b) he did not know why Coder had the shotgun, (c) he (Sanner) did not tell Lamb that he and Coder had "hired out" to kill Tom Kimmons' ex-wife for $3,500, (d) he (Sanner) did not tell Lamb that he and Coder had gone to Springfield to find the ex-wife, (e) he (Sanner) did not tell Lamb that he and Coder, after one or two unsuccessful attempts, told Tom Kimmons they could not kill a woman, (f) he (Sanner) and Coder were not told by Tom Kimmons to bring the ex-wife to the Kimmons farm, and (g) he (Sanner) did not tell Lamb that Tom Kimmons had threatened him.

The special agent testified he was at Lamb's office March 5, 1981, and heard Sanner tell Lamb about the agreement Sanner and Coder made with Tom Kimmons to kill the ex-wife for $3,500, about the trips to her residence in Springfield, about their unwillingness to kill a woman, about Tom Kimmons' directive to bring the ex-wife to the Kimmons farm, about his (Sanner's) and Coder's decision to return the firearms to Tom Kimmons March 3 and "try to get out of the contract," and about the threat Tom Kimmons made to him (Sanner).

All of the statements the special agent testified he heard Sanner make had earlier been attributed to Sanner by Lamb. The special agent was called only because Sanner denied making those statements to Lamb. The special agent did not testify to any new or different statement, or about anything said outside Lamb's presence. Additionally, it appears that Sanner's attorney talked with the special agent before he testified, because the attorney successfully objected to a question asked of the special agent by the State on the ground that the anticipated answer would not rebut anything in Sanner's testimony.

Under these circumstances, we detect no prejudice in the trial court's refusal to exclude the special agent's testimony, and, as already noted, Sanner's brief lends no clue. The point is denied. *Royal,* 610 S.W.2d at 951[12].

Sanner's next point is that the trial court erred in allowing Lamb to testify about "the conspiracy to have the victim's ex-wife killed." Sanner argues this offended the principle that evidence of other crimes[15] is irrelevant to prove a defendant's disposition to commit the crime charged.

Proof of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. *State v. McDaris,* 463 S.W.2d 809, 812[2] (Mo.1971). However, this rule has certain well-established exceptions, one of which is that evidence of other crimes is competent to prove the specific crime charged when it tends to establish motive. *Id.* If such evidence is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime. *State v. Holbert,* 416 S.W.2d 129, 132 (Mo.1967).

Here, the evidence in question established a motive for Sanner and Coder to kill Tom Kimmons, in that it showed Kimmons had threatened to have them killed for refusing to carry out the plan to kill his ex-wife. Crank testified that en route to the Kimmons farm, Coder said Tom Kimmons had pushed him too far and he was going to kill Kimmons. Crank recalled Sanner saying he would do it but he wanted to be able to face George Kimmons and not be a suspect after it was over. After Tom Kimmons was killed, Crank quoted Sanner as saying "it would be pretty easy living from then on."

The evidence was clearly relevant to establish motive, and thus admissible under the "motive" exception. *McDaris,* 463 S.W.2d at 812[2]. The point is denied.

Sanner's next assignment of error is that the trial court erred in denying Sanner's motion for mistrial after Lamb testified that "the other subject" pleaded guilty. The incident occurred while Sanner's attorney was cross-examining Lamb about Lamb's conversations with Sanner:

15. Conspiracy is a crime. §§ 556.016.1 and 564.016, RSMo 1978.

"Q [H]ow many times did you talk to Jerry?

A This is the only time that we've ever talked about this case like this.

Q 'Like this'. Are there times that you talked about this case?

A No, sir.

Q Other than this?

A Nothing, only just about venue and change of venue and stuff like that, just the last few days.

Q In the last few days you've talked to Jerry about that?

A No, nothing about—just the change of venue and about the other subject pleading guilty. He mentioned that back there in his cell."

■ Although not articulated in Sanner's brief, the point we infer he seeks to make is that a defendant is entitled to have his case based solely on the merits of the charge against him, and it is error to introduce evidence to the effect that a codefendant has pleaded guilty or been convicted of the same crime. *State v. Allen,* 599 S.W.2d 782, 785[1] (Mo.App.1980).

In determining whether Sanner should have been granted a mistrial, we first note that Lamb's comment came during questioning by Sanner's attorney. The attorney did not confine his inquiry to the shooting; after Lamb said he talked to Sanner "about venue and change of venue and stuff like that," Sanner's attorney pursued the subject, and received the answer about which Sanner now complains. These circumstances are unlike *United States v. Conley,* 503 F.2d 520 (8th Cir.1974), the only case cited by Sanner. There, the objectionable answer came during direct examination of a prosecution witness, and after two objections about the same subject during the direct examination of an earlier prosecution witness had been sustained.

■ The instant case more closely resembles *State v. Cleveland,* 583 S.W.2d 263, 268[10] (Mo.App.1979). There, a codefendant, testifying for the accused, related that he pleaded guilty to the offense for which the accused was on trial. The Court of Appeals found no prejudice, in that the accused's theory was that the codefendant did indeed commit the crime, but without the accused's participation. Such is the case here. Sanner disavowed any suspicion that Tom Kimmons would be killed, and told the jury he (Sanner) would not have gone to the farm had he known anyone intended to kill Kimmons. Sanner having so testified, we find no prejudice. Additionally, as the answer came during cross-examination, and while Sanner's attorney was pursuing a matter of doubtful materiality, Sanner is in no position to demand a mistrial. *State v. Lee,* 617 S.W.2d 398, 403[5] (Mo.1981). The point is denied.

Sanner next complains that he should have been awarded a new trial because the assistant attorney general asked one of Sanner's character witnesses whether the witness thought "maybe everybody in the penitentiary has changed?" Sanner says this caused the jury to believe he had "always been in the penitentiary." When the incident occurred Sanner's attorney objected and requested a mistrial. The trial court sustained the objection and instructed the jury to disregard the question, but denied the request for mistrial.

■ The point was not raised in Sanner's motion for new trial,[16] and is therefore not preserved for appellate review. *State v. Skaggs,* 650 S.W.2d 23, 25[4] (Mo.App. 1983). Moreover, the question did not refer to Sanner, but to "everybody in the penitentiary." We find no manifest injustice or miscarriage of justice warranting relief as plain error. Rule 29.12(b).

---

16. The only point in the motion for new trial regarding cross-examination of character witnesses is that the assistant attorney general asked them about statements allegedly made to him, leaving the inference that he knew they had lied under oath. This is entirely different than the assignment of error made now. An allegation of error in a motion for new trial may not be changed or broadened on appeal. *State v. Blair,* 631 S.W.2d 91, 94[9] (Mo.App. 1982).

Header

Sanner's next point is that the trial court erred in overruling his objection to Crank's testimony that while he (Crank) and Coder were in the Kimmons house, Coder said, "Jerry said there was some money in the cabinet." Sanner characterizes this testimony as "double hearsay."

 In Missouri, after a conspiracy has been independently shown to exist, statements or declarations of a coconspirator or coactor, made in the furtherance of the object of an unlawful combination, are admissible against another coconspirator or coactor not present when such statements or declarations are made. *State v. McCollum,* 598 S.W.2d 198, 200[1] (Mo.App.1980). Proof of a common criminal purpose, acted upon by the parties, is sufficient to show a criminal conspiracy. *State v. Siekermann,* 367 S.W.2d 643, 647[3] (Mo.1963).

Crank testified Sanner said "we" are going to knock off Tom Kimmons. Crank testified that en route to the farm, Coder said Tom Kimmons had pushed him too far and that he (Coder) was going to kill Kimmons. Crank quoted Sanner as saying he would do it, but he wanted to be able to face George Kimmons and not be a suspect after it was over. This evidence established a conspiracy to kill Tom Kimmons. Accordingly, Coder's statement, related by Crank, was admissible. *State v. Weeks,* 603 S.W.2d 657, 663[5] (Mo.App.1980). The point is denied.

Sanner's final assignment of error is that the verdict directing instruction did not require proof of "all elements and a requisite intent charged in the felony information," and that the instruction is "incomplete and ambiguous in its reference to the necessary findings as to the defendant as an accessory." Sanner further asserts the instruction "does not strictly follow the outlines" of MAI–CR 2d 15.14. He does not explain wherein and why the instruction suffers these claimed infirmities. We have compared the instruction to MAI–CR 2d 15.14, and espy no variance or omission. That part of the instruction submitting Sanner's liability for Coder's conduct correctly submits that issue. We find no merit in the point.

Judgment affirmed.

GREENE, C.J., FLANIGAN, P.J., and TITUS, J., concur.