STATE of Missouri, Respondent,

v.

Charles MORRIS, Appellant.

No. 12879.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 8, 1983.

Motion for Rehearing and to Transfer to
Supreme Court Denied Dec. 23, 1983.

Application to Transfer Denied
Jan. 17, 1984.

Frank V. DiMaggio, Asst. Public Defender, Judicial Circuit 31, Springfield, for appellant.

John Ashcroft, Atty. Gen., William K. Haas, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Charles Morris ("defendant"), tried by jury for capital murder, § 565.001, RSMo 1978, was found guilty of murder in the second degree, § 565.004, RSMo 1978. The jury assessed punishment at 50 years' imprisonment, § 565.008.2, RSMo 1978, and the trial court imposed that sentence.

Defendant appeals, alleging juror misconduct, instructional error, improper prosecutorial argument, and erroneous admission of evidence. Defendant also complains about denial of his request for continuance, and about the endorsement of a State's witness on the information during trial.

The victim was Dennis Callaway. He died from a gunshot wound through the heart. Inasmuch as defendant does not dispute the sufficiency of the evidence to support the verdict, we summarize only such evidence as is necessary to rule the assignments of error.

About 8:30 p.m. Saturday, January 30, 1982, Callaway and a friend, John Ettleman, left Callaway's apartment in Lamar and drove to Golden City in Callaway's Oldsmobile. Their destination was the residence of David Arles and his brother Kenneth, where they planned "to get together to arrange a deal on some marijuana." Ettleman had scheduled the rendezvous by phoning Steven Ianniello, a resident of Carthage, hours earlier.

Upon arrival at the Arles' residence, Ettleman went to the door and obtained David Arles' permission for Callaway to enter. Callaway took a suitcase containing about two pounds of marijuana from the Oldsmobile trunk and entered the house, accompanied by Ettleman. Ettleman thought the marijuana would sell for about $800, and he expected to receive part of that sum for setting up the sale.

Ianniello was seated in the living room when Callaway and Ettleman entered. Ettleman removed his coat and boots, and sat down. Callaway remained standing by the door, near the suitcase.

The four—Callaway, Ettleman, David Arles and Ianniello—talked a few minutes. During the conversation, David Arles, on several occasions, "adjusted" a stereo that had been playing "fairly loud" when Callaway and Ettleman arrived. Ianniello left the room three or four times, entering an adjacent bedroom. Each time Ianniello returned, except the last, he closed the bedroom door.

On his final return, Ianniello left the door ajar and "flipped up the volume" on the stereo to "maximum." Simultaneously, defendant stepped from behind the bedroom door holding a revolver, some 15 feet from Ettleman. Defendant shot at Ettleman. The bullet entered Ettleman's mouth, split his tongue and "removed a few teeth." Ettleman fell on his stomach, facing the front door.

Ettleman heard three more gunshots and saw Callaway making a "resisting effort." Ettleman then lost vision because of blood.

A few seconds later Ettleman saw Callaway on the floor and defendant holding the revolver. Defendant, Ianniello and David Arles moved behind Ettleman. Ettleman heard Ianniello say, "John's not dead yet; you'll have to shoot him again."

Ettleman recalled defendant saying, "Did you see where I shot John that first time?"

Ettleman was shot again, this time in the back near his neck. Ianniello and David Arles then removed Ettleman's wallet and personal belongings. Thereafter, Ettleman saw Callaway's possessions being removed.

Callaway was taken from the room, then the trio carried Ettleman outside to Callaway's Oldsmobile and put Ettleman on the back seat.

Shortly thereafter, the trio got in the front seat, Ianniello driving. They drove 20 to 30 minutes, during which time Ettleman overheard defendant say he hoped Callaway and Ettleman enjoyed the morphine because they certainly deserved it. Ettleman inferred from this that defendant believed Callaway and Ettleman had stolen some morphine from Ianniello and David Arles a few days earlier. Ettleman also heard defendant say he was going to Kevin Patrick's house. Ettleman knew Patrick lived several miles east of Carthage.

Near the end of the journey, the Oldsmobile turned on a gravel road and went a mile or two farther before stopping.

The trio dragged Ettleman from the Oldsmobile and "dumped" him in a "wooded area" 15 to 20 feet from the road. Then, they removed Callaway's body from the trunk, dragged it to where Ettleman lay, and "dropped" it on Ettleman's legs. The trio then drove away in the Oldsmobile.

It was "cold and snowing," with perhaps three inches of snow on the ground. Ettleman, at this point, was wearing only a "thin shirt," jeans and socks. Ettleman put on Callaway's boots and coat and began walking. Eventually, he reached a house and explained his situation to the occupants, who notified the sheriff's office and called an ambulance. The house was within a quarter mile of the Patrick residence.

Jasper County deputy sheriff Freddie Garrison was the first officer to reach the house where Ettleman was, arriving about 11:00 p.m. An ambulance and other officers, including deputy sheriff Steve Weston, arrived soon afterward.

Ettleman, by this time, was having difficulty talking, so he wrote the names of defendant, Ianniello, David Arles, Kenneth Arles and Kevin Patrick on a paper. Ettleman told Weston what had happened at the Arles' residence, identifying defendant and David Arles as the two persons who had shot him. Ettleman explained that Callaway was dead, and gave directions for finding the body. Ettleman was then taken by ambulance to a hospital.

Weston, Garrison and others began searching for Callaway's body. Garrison found it within an hour. He checked for vital signs, but detected none.

Weston, Garrison and other officers then went to Kevin Patrick's house and arrested him for "investigation." He directed the officers to the home of his cousin, Jerry Patrick, at the "north edge of LaRussell" in Lawrence County. The officers went there and were allowed inside by Jerry Patrick. They found defendant asleep on a couch and arrested him for investigation of homicide. Defendant was taken to the Jasper County jail.

At the jail, around 3:00 a.m., January 31, investigator James Manning of the Jasper County sheriff's office took all of defendant's clothing, including his socks, and "bagged" them as evidence.

Robert Lawrence, a Jasper County deputy sheriff, performed a "gunshot residue" test on defendant's hands that same date (January 31). This procedure consisted of dipping "swabs" into a "control substance" and rubbing the swabs across defendant's hands. Subsequent examination of the swabs by a chemist indicated defendant could have shot a firearm, but the chemist could "not say definitely."

Meanwhile, another Jasper County deputy sheriff telephoned Sheriff L. Ron Jeffries of Barton County and relayed the information furnished by Ettleman. Jeffries, aided by the prosecuting attorney of Barton

County, obtained a search warrant for the Arles' residence. Jeffries, Weston, Garrison and several other officers went to Golden City, reaching the Arles' residence between 3:00 and 4:00 a.m., January 31. David Arles responded to Jeffries' knock, and was arrested for investigation of capital murder. The officers entered and found Ianniello in a bedroom. He was also arrested for investigation of capital murder. There were no other occupants in the house.

Jeffries saw what appeared to be blood on the carpet, and cut out some pieces of carpet for evidence. He also noticed a bedspread and sheet hanging over the entrance to the kitchen, and observed what appeared to be blood on the sheet. He took the bedspread and sheet as evidence. Garrison saw two stereo speaker covers with what appeared to be blood on them. He collected them as evidence.

Blood specimens were taken from Ettleman, and from Callaway's body, and delivered to a serologist. The serologist compared those specimens with stains on the items removed from the Arles' house. Bloodstains consistent with Callaway's blood were found on one of the pieces of carpet and on both speaker covers. Bloodstains consistent with Callaway's blood, together with bloodstains consistent with Ettleman's blood, were found on the bedspread. Bloodstains consistent with Ettleman's blood were found on the sheet.

The serologist also examined the socks removed from defendant by Manning, and found bloodstains consistent with Callaway's blood on one of them.

Defendant testified he was not at the Arles' house on the night of January 30. Defendant said he spent several hours that evening in various bars before going to the Kevin Patrick home about 10:30 p.m. Later, according to defendant, David Arles came by, and following that, defendant went with Jerry Patrick to the latter's home, where the arrest occurred. Defendant added that he had shot a pistol the afternoon of January 30.

Stephen Meyers testified he was with defendant in the bars on January 30, and drove defendant to the Kevin Patrick home.

■ Defendant's first point asserts the trial court erred in denying defendant's motion for mistrial after the alternate juror entered the jury room when the jury retired to deliberate.

Twelve jurors and an alternate, § 494.-065, RSMo 1978, as amended by Laws 1979, p. 627, heard the evidence. The alternate accompanied the jury when it departed the courtroom to deliberate. Three minutes later, the court advised counsel that the bailiff indicated the jury wanted the exhibits. The court instructed the bailiff to take the exhibits to the jury. Seven minutes thereafter, the bailiff, on order by the court, brought the alternate juror to the bench. This colloquy followed:

"THE COURT: Mr. Miller, I about left you in there. You were the alternate. I show that you all went in at three fifteen. It is now about three twenty four. Had you started any deliberations yet?

JUROR MILLER: No. Hadn't got out of the bathroom yet.

THE COURT: No deliberations yet?

JUROR MILLER: No.

THE COURT: Mr. Miller, you are excused at this time. This means you can leave. You were here in case somebody got sick up until the time the deliberations started.

Do either of you have any questions you wish to ask, I don't mean what his opinion is.

[PROSECUTING ATTORNEY]: I have none.

THE COURT: Defense?

[DEFENSE COUNSEL]: No, Your Honor."

The court thereupon discharged the alternate.

Defendant argues that the jury's request for the exhibits shows that deliberations had begun while the alternate was in the

jury room. Relying on § 546.240, RSMo 1978, which provides that no person shall be allowed to communicate with the jury during its deliberations except by order of the court, defendant says he should receive a new trial.

*State v. Hayes,* 637 S.W.2d 33, 38[8] (Mo. App.1982), quoting from *State v. Quinn,* 405 S.W.2d 895 (Mo.1966), holds that private communications, possibly prejudicial, between jurors and third persons are absolutely forbidden, and invalidate the verdict unless their harmlessness is made to appear. In *Hayes,* as here, the trial court neglected to discharge the alternate juror before the jury retired to deliberate. In *Hayes,* all 12 jurors and the alternate subsequently stated, by affidavit, that the alternate did not participate in or influence the jury's deliberations. The trial court in *Hayes* found that the defendant was not prejudiced by the alternate's presence during deliberations; the Court of Appeals held the trial court did not abuse its discretion in denying the defendant's request for mistrial.

In the instant case, the alternate juror stated unequivocally that he had not begun deliberations when he was brought to the bench. Counsel for both sides were given the opportunity to question the alternate, but neither did. The fact that a request was made for the exhibits does not, in our opinion, refute the alternate's statement, particularly in light of his explanation that he had not even gotten out of the bathroom when the court sent for him.

We hold the record affirmatively shows there was no communication by the alternate juror to the jury after the jury retired to deliberate. Defendant's first point is denied.

■ The trial court gave verdict directing instructions on capital murder, murder in the second degree, and manslaughter. Each instruction hypothesized that defend-

ant caused Callaway's death by shooting him "on or about January 30, 1982." Defendant's second point assigns error in the failure of these instructions to specify the time of the homicide. Defendant says this omission effectively nullified his alibi defense. He fails, however, to explain why.

In considering the point, we are mindful that as a general rule, a defendant may not complain about an instruction on an offense for which he was not convicted.[1] *State v. Frank,* 639 S.W.2d 209, 211[3] (Mo.App. 1982). It thus appears we need not consider the assignment of error in regard to the capital murder and manslaughter instructions. However, as the identical complaint is made regarding the second degree murder instruction, we necessarily address it in deciding whether there was error in that instruction.

In support of point 2, defendant cites *State v. Clark,* 509 S.W.2d 740 (Mo.App. 1974), and *State v. Siems,* 535 S.W.2d 261 (Mo.App.1976). Neither aids him. In *Clark,* a verdict directing instruction submitting that the offense occurred on a specific date was upheld against the contention that it "burdens" an alibi defense. *Clark,* 509 S.W.2d at 744[9]. In *Siems,* the information charged the offense was committed on or about February 23, 1972, but the verdict directing instruction submitted that the offense was committed during the month of February, 1972. The evidence showed the offense occurred toward the latter part of that month. The accused presented alibi evidence regarding the last weekend of the month. The instruction was upheld. *Siems,* 535 S.W.2d at 265, 266.

Here, the State's evidence showed defendant shot Callaway at the Arles' residence between 8:30 p.m. and 11:00 p.m., January 30, 1982. Defendant's alibi evidence placed him elsewhere during that time period. Each side's argument to the jury was focused on that interval. The

---

1. An exception exists if a defendant is found guilty of a higher grade of offense and an error exists in an instruction on a lesser grade of offense that prevents the jury from convicting on the lesser offense. *State v. McIlvoy,* 629 S.W.2d 333, 338[8] (Mo. banc 1982).

instructions given by the trial court included MAI–CR 2d 3.20, which placed upon the State the burden of proving beyond a reasonable doubt that the defendant was present at the time and place the offense is alleged to have been committed. There was no contention by the State that defendant shot Callaway at any time other than the period embraced by defendant's alibi evidence. In these circumstances, we fail to see how defendant was prejudiced by the failure of the verdict directing instruction to submit the precise time of the shooting. Point 2 is without merit.

Defendant's third point states the trial court erred in denying defendant's motion for mistrial when the prosecutor improperly mentioned defendant's prior convictions in closing argument, thereby violating defendant's right to be tried for the offense with which he was charged.

At the outset of his testimony, defendant was asked by defense counsel whether he had ever been convicted of any other offenses. Defendant admitted convictions for burglary, grand theft and "attempted strong arm." In closing argument, defense counsel told the jury defendant was honest in revealing these convictions, and argued that the jury must not consider the convictions as any evidence that defendant killed Callaway.[2] In reply, the prosecutor argued:

"He was honest to tell you about his prior convictions. The defendant knows darned good and well if he doesn't—"

At this point, defense counsel objected, but made no motion for mistrial. The objection was overruled. The prosecutor continued:

"He knows if he doesn't admit it, he knows darned good and well I'll prove he has been convicted before. I have those convictions in my file and I'll prove it if he doesn't admit it."

As defendant made no motion for mistrial, his allegation that the trial court erred in denying such a motion is a misstatement of the record. Nonetheless, as defense counsel did make an unavailing objection to the prosecutor's argument, we will consider whether the trial court erred in overruling the objection.

It is, of course, permissible for a prosecutor to make reference in closing argument to a defendant's prior convictions insofar as they reflect upon the defendant's credibility as a witness when he has chosen to testify. *State v. Ray,* 600 S.W.2d 70, 74[5] (Mo.App. 1980). A defendant's testimony is subject to argument on credibility the same as any other witness. *State v. Wren,* 643 S.W.2d 800, 802[4] (Mo.1983).

Here, defense counsel argued to the jury that defendant was honest in telling about his previous convictions. Defense counsel's argument was obviously aimed at enhancing defendant's credibility. The prosecutor's response was retaliatory to that argument.

A defendant may not provoke a reply to his own argument and then assert error. *State v. Therman,* 597 S.W.2d 254, 256[4] (Mo.App.1980). In retaliating against a defendant's argument, a prosecutor may exceed the bounds otherwise limiting the content of his initial argument. *State v. Sims,* 639 S.W.2d 105, 110[15] (Mo.App.1982). Considerable discretion is vested in the trial court to regulate the use of retaliatory arguments. *Id.* at 111[16].

As the prosecutor's argument was retaliatory, we need not decide whether it would have been proper absent defendant's argument. Given the discretion lodged in the trial court to regulate retaliatory arguments, we hold the trial court did not abuse its discretion in overruling defendant's objection. Point 3 is denied.

**2.** At defendant's request, the trial court gave MAI–CR2d 3.58, in the following form:

"If you find and believe from the evidence that defendant was convicted of the offenses of attempted robbery, stealing and burglary you may consider that evidence for the sole purpose of deciding the believability of the Defendant and the weight to be given to his testimony and for no other purpose. You must not consider such previous convictions as any evidence that the Defendant is guilty of any offense for which he is now on trial."

■ Defendant's fourth point assigns error in the trial court's denial of two defense motions for continuance for the purpose of gaining time for defense counsel[3] to interview defendant's alibi witness, Stephen Meyers.

Ten days before trial, defendant filed a motion for continuance, alleging Meyers was incarcerated in Newport News, Virginia. The thrust of the motion was that Meyers could not be produced at defendant's trial ten days hence. The motion was denied.

On the day trial began, defendant renewed the motion for continuance, expressing concern that although arrangements had been made to fly Meyers to Barton County, bad weather or some other obstacle might prevent Meyers from arriving in time to testify. The motion was again denied. On neither occasion did defense counsel state he would need a continuance to interview Meyers after Meyers arrived.

Meyers was delivered to the courthouse during the afternoon of the second day of trial. Before recessing for the evening meal, the trial court asked defense counsel whether an hour and a half would be sufficient time for him to interview Meyers. Defense counsel stated he would rather have two hours. Trial was then recessed, and about two hours later the court asked defense counsel if he was ready to proceed. Defense counsel replied, "Ready, Your Honor." Trial resumed and several witnesses, including Meyers, testified before the overnight adjournment.

The first flaw in defendant's fourth point is that the two motions for continuance were for the stated purpose of obtaining Meyers' presence at defendant's trial, not for the purpose of delaying the trial after Meyers arrived. Inasmuch as Meyers was present when called to testify, the denial of those motions is moot.

The second flaw is that after Meyers arrived, defense counsel received all of the

time he requested to interview Meyers, and answered affirmatively when asked by the court if he was ready to proceed. Having received all relief requested, defendant will not now be heard to say he should have been given additional relief. *State v. Rodriguez*, 581 S.W.2d 50, 52[2] (Mo.App.1979). The point is denied.

■ We next consider defendant's seventh point, which complains that the trial court abused its discretion in allowing investigator Manning, whose name was not endorsed on the information before trial, to testify. Manning identified the socks he removed from defendant at the jail, and testified he thereafter turned them over to a deputy sheriff. Defendant complains he was prejudiced by this testimony because the blood on one sock proved to be the same type as Callaway's. Defendant also alleges that Manning's testimony was necessary to establish the chain of custody to admit the results of the gunshot residue test into evidence. This latter complaint, however, is unsupported by the record.

In a pretrial hearing on a motion by defendant to suppress the results of the gunshot residue test, Manning testified he transported several items of evidence to a laboratory, and that the gunshot residue test kit might have been among them. However, at trial deputy sheriff Lawrence, who performed the test on defendant, testified he turned the kit over to deputy sheriff Larry Parrill. Parrill testified he delivered the kit to the laboratory. Manning's testimony at trial contained no reference to the kit. Accordingly, in ruling defendant's seventh point, we need consider his complaint only with respect to Manning's testimony regarding the socks.

Delay in endorsing the names of witnesses is sought to be discouraged by Rule 23.-01(f), Missouri Rules of Criminal Procedure (13th ed. 1982), however our Supreme Court recognizes that late endorsements must sometimes be permitted if they can be made

---

**3.** Defendant's counsel on appeal was not counsel at trial.

without prejudice to the defendant's rights. *State v. Strawther,* 476 S.W.2d 576, 579 (Mo.1972); *State v. Carmack,* 633 S.W.2d 218, 220 (Mo.App.1982). The trial court has broad discretion in permitting the endorsement of additional witnesses on the information, and a judgment of conviction will not be reversed because the name of a witness was endorsed during trial unless it is shown that the defendant was thereby prejudiced. *Strawther,* 476 S.W.2d at 579. In the exercise of the court's discretion, many factors may be taken into consideration, including whether in fact defendant was surprised and suffered any disadvantage, and whether the type of testimony given might readily have been contemplated. *Id.*

The record here fails to demonstrate any prejudice to defendant. He was obviously aware before trial that the State intended to use the socks as evidence, because he filed a pretrial motion to suppress their admission. Defendant does not contend he was surprised, or that he suffered any disadvantage that would have been alleviated had Manning's name been timely endorsed. Moreover, there was no dispute about the identity of the socks. Defendant, in his trial testimony, identified the socks as his, and did not dispute Manning's testimony in any respect.

As there is no showing that defendant was prejudiced by the endorsement of Manning as a State's witness during trial, the trial court did not abuse its discretion in allowing the endorsement. Defendant's seventh point is denied.

In point 5, defendant says his arrest was without probable cause, therefore his socks were unlawfully seized and the gunshot residue test was unlawfully administered. Defendant contends all evidence regarding the socks and the test should have been suppressed, and that the trial court erred in admitting the socks and the test kit into evidence.

When Manning was called to testify at trial about seizing defendant's socks, the only objection defendant made was that Manning had not been endorsed as a witness. Manning identified defendant's socks and testified about seizing them, without further objection. When the socks were offered in evidence, defendant objected because Manning was in the chain of custody and had been neither endorsed nor disclosed. Defendant made no objection regarding the lawfulness of the seizure.

■ Even though defendant filed a pretrial motion to suppress the socks on the ground that they were unlawfully seized, it was nonetheless his obligation to keep the point alive by renewing that objection when the socks were offered at trial. *State v. Yowell,* 513 S.W.2d 397, 402[1] (Mo. banc 1974). As defendant failed to do so, the point is not preserved for appellate review. *Id.* at 402[2]; *State v. Hulsey,* 557 S.W.2d 715, 718[4] (Mo.App.1977). However, even had the point been preserved, it would be unavailing, as there was probable cause for defendant's arrest, as discussed, *infra.*

The complaint regarding the gunshot residue test suffers the same infirmity. That item, like the socks, was the subject of an unsuccessful pretrial motion to suppress. When the test kit was offered in evidence at trial, defendant's only objection was that Manning was in the chain of custody and his name was not endorsed on the information.

However, even if the point had been preserved regarding both items, it would fail on the merits, inasmuch as there was probable cause to believe defendant had committed a felony (murder), thereby authorizing his arrest without warrant. *State v. Franco,* 625 S.W.2d 596, 602[6] (Mo.1981).

■ Probable cause for an arrest without a warrant exists where the facts and circumstances within the arresting officers' knowledge and of which they have reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in a belief that an offense has been or is being committed, and

that the person arrested is guilty of that offense. *State v. Olds,* 603 S.W.2d 501, 505[2] (Mo. banc 1980). Probable cause is to be determined upon the objective facts available for consideration by the agencies or officers participating in the arrest; otherwise each individual officer would have to be fully briefed or informed of all the essential factors in each case before proceeding to make an arrest upon probable cause. *State v. Sanner,* 655 S.W.2d 868, 874 (Mo. App.1983). In the operation of an investigative or police agency, the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause; the arresting officer himself need not possess all of the available information. *Id.*

 Here, at the time defendant was arrested, the officers of the Jasper County sheriff's office knew, collectively, that Callaway was dead and that Ettleman had reported he was with Callaway when both were shot by defendant earlier that evening. This information was sufficient to create probable cause. *State v. Whorton,* 487 S.W.2d 865, 867[2] (Mo.1972).

 Defendant's arrest being lawful,[4] seizure of his socks at the Jasper County jail was lawful, *Kansas City v. McCoy,* 525 S.W.2d 336, 340[5] (Mo. banc 1975), as was the administration of the gunshot residue test, *State v. Parsons,* 513 S.W.2d 430, 440–41[12] (Mo.1974). Defendant's fifth point is denied.

 In point 6, defendant assigns error in the admission in evidence of the carpet, speaker covers, bedspread and sheet seized at the Arles' residence when David Arles and Ianniello were arrested. Defendant contends the search warrant under which the officers acted was invalid, therefore the search and seizure violated U.S. Const. amend. IV, and Mo. Const. art. I, § 15.

The point is answered by *State v. Nichols,* 628 S.W.2d 732 (Mo.App.1982), which holds that a defendant who seeks to suppress

evidence on the above constitutional grounds has the burden of showing not only that the search was illegal, but also that he had a legitimate expectation of privacy in the thing which was searched. *Nichols* contains an exhaustive analysis of the development of that rule, and we need not repeat what was said in *Nichols.* It is sufficient to note that here, defendant made no showing that he had a legitimate expectation of privacy in the Arles' residence. The only testimony pertinent to that subject came from Sheriff Jeffries, who testified he did not believe defendant "had any connection or ownership of that house," and from defendant, who testified that at the time of the events in question, he was living with Esther and Glen Patrick, his "former in-laws."

As defendant failed to show he had any legitimate expectation of privacy in the Arles' house, he was not a person aggrieved by the search thereof, or by the seizure of evidence therein. Accordingly, he may not complain. The point is denied.

Judgment affirmed.

GREENE, C.J., FLANIGAN, P.J., and TITUS, J., concur.

---

4. We do not read defendant's brief as arguing that his arrest was unlawful because it was made in Lawrence County by Jasper County deputy sheriffs. Any such contention would be without merit. *State v. Gay,* 629 S.W.2d 470, 473[6] (Mo.App.1981).