**STATE of Missouri, Respondent,**

v.

**Charles Edward WOODS, Appellant.**

**Nos. 14433, 14434.**

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 22, 1986.

Motion for Rehearing or Transfer
Denied Jan. 12, 1987.

Application to Transfer Denied
Feb. 17, 1987.

Charles M. Shaw, C. Clifford Schwartz, Shaw, Howlett & Schwartz, Clayton, for appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Chief Judge.

A jury found Charles Edward Woods ("appellant") guilty of the class D felony of sexual abuse in the first degree, § 566.100.-1(2), RSMo 1978, and guilty of the class B felony of sodomy, § 566.060.3, RSMo Cum. Supp.1983. The jury assessed punishment at 5 years' imprisonment for the sexual abuse, and 15 years' imprisonment for the sodomy. The trial court imposed those sentences, running them concurrently.

Appellant briefs 10 assignments of error. Their broad range requires an introduction of the individuals involved in the events discussed herein.

The alleged victim of the sexual abuse was J___ D___ C___, Jr., hereafter referred to as "the eldest boy." He was born June 28, 1973. The alleged victim of the sodomy was R___ L___ C___, a younger brother of the eldest boy. R___ L___ C___, hereafter referred to as "the middle boy," was born June 24, 1976. A third boy, P___ A___ C___, was also caught up in the events in issue. He is a younger brother of the two boys previously mentioned. P___ A___ C___, hereafter referred to as "the youngest boy," was 4 years of age in May, 1984, the month in which the crimes were alleged to have occurred.

The mother of the three boys, R___ P___ C___, hereafter referred to as "the mother," was unmarried at the time of the incidents in issue, her marriage to their father having ended in "divorce" in September, 1982.

The mother was a friend of one Deronda Greer, who, prior to October, 1983, resided in a house on Dye Street in Sikeston. The mother and the three boys frequently visited Deronda Greer and her children at Deronda's residence.

During the period when the mother and the three boys were going to Deronda Greer's, appellant was residing "[d]irectly across the street" from Deronda. The mother was acquainted with appellant, as he had married one of Deronda's sisters, Patsy, whom the mother had known since childhood.

The mother explained that she and her three boys would occasionally see appellant when they were visiting Deronda Greer.

The mother testified:

"[Appellant] was outside, and sometimes he would come across the street at Deronda's to borrow ice or something like that.

Q The boys had the opportunity to see him?

A Yes.

Q Knew who he was?

A Yes.

Q Did you ever talk to Charles Woods?

A Yes, I have.

Q Have you ever talked to him on the telephone?

A Yes."

The incident that triggered this prosecution occurred about 1:00 a.m., Thursday, May 24, 1984. At that time, the mother and her three boys were residing in a house near, but not on, Dye Street. Present in the residence were the mother, the three boys (who were asleep), and one Gary "Butch" Woodall, described by the mother as her "boyfriend." Woodall, according to the mother, was a brother of appellant's wife, Patsy.

The mother recounted that the telephone rang, and she answered it. She recognized the caller's voice as that of appellant. The mother's testimony proceeded:

"Q Do you recall the contents of that conversation?

A Yes.

Q What was said?

A He asked me what I was doing and I said 'Nothing,' and then he started laughing. And he said, 'She says she's not doing anything,' and—

Q Saying that to you?

A Yes. Well, he was saying it to somebody else when he said that, and then he laughed. Then he wanted to know what I was doing. And I asked him, 'What do you want?' And then he started using profanity, so I hung up on him.

Q Could you hear anybody else talking in the background?

. . . . .

A I heard somebody else laugh in the background, talking—I couldn't understand what they were saying.

. . . . .

Q Did anything happen after that?

A Yes. He called back.

Q About how long was it from the time you hung up until you got another call?

A Just long enough for him to dial the number back.

Q Did you answer the phone?

A Yes.

Q Did you have a conversation?

A Yes.

Q Did you know who you were talking with?

A Yes.

Q Who was that?

A Charlie Woods.

. . . . .

Q What was said?

A He said that he knew that Butch was there, and I said, 'How do you know that? And he said he had been patrolling around the house. And I said,

'Charlie, I know this is you, and do not call back.' I said, 'You have no business calling here.' And he told me that he was John Evans, and then he said—then there was laughter, and then he started using profanity again, so I hung up.

Q Then he called back?

A Yes, he did.

Q About how much time was it between when you hung up and you got the other call?

A Just long enough to dial it.

Q And you had a conversation the third time?

A Yes. But this time it wasn't Charlie. It was somebody else.

Q Do you know who that was?

A No, I don't.

Q Did you talk with Charles Woods any time during that conversation, that phone call?

A Just a little bit, because he got on the phone and he hung up, but this guy was talking.

. . . . .

Q Any other phone calls occur that night?

A Yes.

Q How long after the third?

A Just long enough for me to hang up and then them to call back. He wanted to speak to Butch.

Q Who was it this time asking?

A Charlie.

Q And Butch—

A Butch got on the phone and there was cursing and he told Butch that he could—

. . . . .

Q Could you hear what was being said on the telephone?

A Yes, I could.

Q How could you do that?

A Because I was on the other phone.

Q What was Charles saying?

. . . . .

A To Butch?

Q Well, that you heard.

A He just told him that he didn't like him or his family, especially his mother, and he asked Butch if he still had that little gun, you know, and he said that he had one that was a lot bigger and better. And it was just mostly cursing.

Q Now, Butch was his ex brother-in-law—was Charles Woods ex brother-in-law?

A Right.

Q When had Patsy and Charles gotten divorced, if you know?

A I don't remember when they got divorced.

Q Was it before this May of 1984?

A I'm not for sure.

Q Were they separated?

A Oh, yes, they were separated, but I'm not for sure if they was divorced then or not.

Q Had Patsy and Charles been separated for quite a while at that time?

A Oh, yes.

Q Any other phone calls that night?

A He called back again to talk to Butch.

Q Who answered the phone that time?

A Butch did.

Q Did you listen to that conversation?

A No. No, I didn't.

Q Any other phone conversations that you participated in?

A Well, Butch told me to keep him on the phone because he was going to circle around to where the pay phone was to see if Charlie was there using the phone, and then I carried on a conversation with Charlie at that time while he was gone.

Q Do you remember what you and Charlie talked about while you were trying to keep him on the phone?

A Yes. He said that—well, he said he didn't like Butch and didn't want Butch there. He said that he had a crush on me, and he asked where the boys was. And I told him they was in bed. And he said that he was going by at night to make sure me and the boys

was all right. And he also said—after—well, he said, 'Where are the boys?' And I said, 'They are asleep.' And he said, 'Well, I like your boy.' I said, 'My boy?' And he said, 'Yes.' And I said, 'Which one?' And he said, '[The youngest boy].' And he said, 'I know [the youngest boy] graduated last Thursday night and I know where at, which church.'

⋅ ⋅ ⋅ ⋅ ⋅

Q Did you do anything about that conversation that night?

A I did call the police department to talk to John Evans to tell him what was going on, that [appellant] was using [Evans'] name, and they told me that [Evans] was out patrolling. And I just stayed up all night.

Q Up to that point in time, had you been romantically involved with Charles Woods?

A No."

The following morning, the mother got the eldest boy and the middle boy "off to school," then telephoned Deronda Greer and told her about appellant's phone calls. The mother thereafter took the youngest boy to Deronda's, where the mother and Deronda questioned him about appellant. As the mother's testimony regarding what she learned from the youngest boy is the subject of appellant's point V, we defer summarizing that segment of the mother's testimony until we consider that point.

The mother and Deronda then picked up the middle boy and the eldest boy from their respective schools and took all three boys to the Sikeston police department. From there, the boys were taken to Dr. Thomas J. Harrison, Jr., for examination.

The prosecuting attorney filed two cases against appellant: case number CR584–383FX ("the first case"), and case number CR584–384FX ("the second case"). As best we can determine from the record, a single preliminary hearing was held June 20, 1984, at which evidence was presented regarding both cases.

On June 25, 1984, a felony information was filed in the first case, and a felony

information was also filed in the second case. The information in the first case accused appellant of committing sexual abuse in the first degree on or about May 17, 1984, by subjecting the eldest boy to sexual contact. The information in the second case contained two counts. Count I accused appellant of committing sodomy on or about May 17, 1984, by having deviate sexual intercourse with the middle boy. Count II accused appellant of committing sodomy on or about May 17, 1984, by having deviate sexual intercourse with the youngest boy.

On May 15, 1985, some 324 days after the informations were filed, the State filed a motion for leave to file an amended information in each case. Each motion averred that appellant had "received all information in the form of reports and discovery which relates to this matter and which indicates that the alleged offenses occurred during a period of time from May 1, 1984, through May 1984."

The motions were accompanied by a letter from an assistant prosecuting attorney, asking the circuit clerk to "place these matters on the docket for the next law day, May 23, 1985."

The amended information which the State sought to file in the first case alleged that the sexual abuse occurred "between May 1, 1984 and May 24, 1984." The amended information which the State sought to file in the second case alleged that both offenses of sodomy occurred "between May 1, 1984, and May 24, 1984."

The docket sheet in the first case and the docket sheet in the second case each bear an entry dated May 23, 1985. Each entry shows that the prosecuting attorney appeared in the trial court that date, along with appellant and his attorney.[1] Each entry states, "Cause is set for trial on June 24, 1985." Neither entry mentions the State's request to file an amended information.

On May 28, 1985, the circuit clerk sent a letter to the prosecuting attorney and to appellant's attorney. The letter pertained to both cases. It stated: "Please be advised of docket entry on May 24, 1985. Leave granted the State to file an Amended Information."

Nothing further occurred until the morning of trial, June 24, 1985. Immediately prior to voir dire, appellant filed a motion in each case asking the trial court to strike the amended information and to proceed to trial on the original information. Appellant's motions averred, "The amended informations were brought about by discovery by Prosecuting Attorney that the defense attorney was relying on alibi, with alibi as his defense, since the only child testifying at the preliminary hearing pinpointed the date as May 16, 1984."

Simultaneously with the filing of those motions, appellant filed a motion in each case praying the court to order the State to file a bill of particulars setting forth the date of the alleged offense and the location where it occurred.

In support of the motions to strike the amended informations, appellant's counsel argued to the trial court, "May 1st to May 24 puts us in a bind, Your Honor, when we are relying upon the defense of alibi, and in preparing for trial, we have no way of knowing—I assume that the little boys are going to change their story about the dates of when this happened." Appellant's counsel added: "At the preliminary hearing, Judge, we have the transcript, the one boy that testified said it was around the 16th or 17th of May. Then when we filed our response to disclosure and listed the alibi and that this guy, there was no way he could have been even in that vicinity or area during those days, then the State files an amended information saying, 'Well, from May 1 to 24.'"

The trial court denied the motions to strike the amended informations. The trial court then inquired, "Is all discovery fin-

1. The attorney who represented appellant in the trial court is not the attorney representing appellant in these appeals.

ished, W——?" Appellant's counsel replied, "Yes, sir."

The trial court thereafter took up, and denied, the motions for bills of particulars. After a discussion of other items not germane to these appeals, the prosecutor asked the trial court to consolidate the first case and the second case, so that the offense charged in the first case could be referred to during the trial as Count I, the offense charged as Count I in the second case could be referred to during the trial as Count II, and the offense charged as Count II in the second case could be referred to during the trial as Count III.

The trial court granted the request. The prosecutor thereupon moved for "nolle pros" of newly designated Count III, the charge of sodomy involving the youngest boy.

The trial court then arraigned appellant on newly designated Count I, the sexual abuse charge, and newly designated Count II, the sodomy charge involving the middle boy. Appellant announced that his plea to each count was not guilty.

Appellant's counsel then asked that the motion for a bill of particulars be shown as filed after the arraignment. The trial court assented, and again denied the motion. At that point, appellant's counsel stated, "Judge, we would like these cases sent back to the associate court for another preliminary hearing."

The trial court denied that request, the jury was selected and sworn, and the trial proceeded.

The mother was the first witness called by the State. Her testimony about appellant's phone calls to her on May 24, 1984, has already been set forth. We now direct our attention to the portion of the mother's testimony which is attacked by appellant in his point V.

The mother, it will be recalled, took the youngest boy to Deronda Greer's house the morning following the phone calls. Asked what occurred at Deronda's, the mother testified:

"We asked [the youngest boy] ... had he seen Charlie, and he said, 'Yes,' and I said, 'Where at?' And he said, 'Down the street.' He said Charlie put him in his truck. He said Charlie wanted to drive him around, but Charlie just put him in the back of his truck. And I said, 'What color is his truck?'

[APPELLANT'S COUNSEL]: I'm going to object, Your Honor, to what her child told her.

THE COURT: Objection overruled.

[PROSECUTOR]: Go ahead.

A I said, 'What color is his truck?' And he said, 'Red.' I asked him, I said, 'Did Charlie do anything to you, son?' And he said, '[The eldest boy] knows, [the middle boy] knows.' But that's all he would ever say."

The mother explained that she and Deronda Greer then picked up the middle boy at school and asked him whether he had seen appellant. At that point, appellant's counsel objected that what the boys told the mother was hearsay. A lengthy bench conference ensued, during which appellant's counsel, among other things, requested the trial court to instruct the jury to disregard the mother's testimony as to what the youngest boy said. When proceedings resumed in open court, the trial court stated: "Ladies and gentlemen, please disregard the statements that [the youngest boy] ... may have said to the mother. You will disregard those statements."

The mother's testimony then resumed:

"Q Did you have a conversation with [the middle boy] at school?

A After I got him in the car.

Q After you had that conversation, where did you go?

A Over to Matthews.

Q Matthews?

A Where [the eldest boy] goes.

.　　.　　.　　.　　.

Q What did you do when you got there?

A I asked—I told [his teacher] that I needed to talk to [the eldest boy], and I

took him outside the classroom and I asked him if he had seen Charlie. And he started crying.

[APPELLANT'S COUNSEL]: Judge, we are going to object on the same grounds that we made up there. I just want my objection continuing.

THE COURT: Objection overruled.

Q Don't tell me anything he might have said, just tell me what you observed, what you saw.

A He stepped back, and that's it.

Q Then what did you do?

A I asked him if Charlie had been bothering him in any way, had touched him. And that's when he started crying. He said that he didn't—

Q You can't tell me anything that [the eldest boy] might have said, just what you observed. After you had seen that reaction from [the eldest boy], what did you do?

A Went back to Deronda's house and we got some things for her baby to take to the sitter. We dropped her baby off and we went to the police department."

Appellant's point V states:

"The trial court committed prejudicial error in allowing [the mother] ... of the alleged victims, to testify, over specific objection of [appellant], as to what her children ... stated to her as to what happened, for the reason that such evidence was hearsay and as a result the [appellant] was significantly prejudiced thereby for the following reasons:

a. The charge against [appellant] pertaining to [the youngest boy] was nolle prossed and, therefore, the introduction of this evidence constituted an impermissible reference to a prior crime and prejudiced the [appellant].

b. The statements of [the middle boy] and [the youngest boy] constituted incompetent evidence in that [the youngest boy] was nolle prossed prior to trial and [the middle boy] failed to qualify as a witness in chambers and thereby denied the [appellant] his constitutional right to confront witnesses and cross-examine witnesses by virtue of the court's erroneous admission of the hearsay statement."

In connection with appellant's assertion that the middle boy "failed to qualify as a witness," the transcript shows that the trial court conducted a hearing, in chambers, on the issue whether the middle boy was competent to testify. Despite § 491.060, RSMo Cum.Supp.1984,[2] which was in effect at the time of trial, the trial court ruled that the middle boy did not "qualify" to testify. The trial court also, in chambers, conducted a hearing to determine whether the eldest boy (who was 4 days short of 12 years of age at time of trial) was competent to testify. The trial court found in the affirmative on that issue.

At that point, the transcript shows this:

"[APPELLANT'S COUNSEL]: Judge, at this time, and out of the presence of the jury, I would like to move for a mistrial based upon the testimony of [the middle boy], of recital of the testimony and what [the middle boy] would have said. And now that the Court, out of the hearing of the jury, has tried to qualify him and couldn't qualify him, that the things that jury has heard, you can tell them all day to disregard it, but you know as well as I do that there is no way you can get that out of their mind, and it's so prejudicial to this [appellant] that

---

**2.** Section 491.060, RSMo Cum.Supp.1984, provided:

"The following persons shall be incompetent to testify:

(1) A person who is mentally incapacitated at the time of his production for examination;

(2) A child under ten years of age, who appears incapable of receiving just impressions of the facts respecting which he is examined, or of relating them truly; provided, however, that except as provided in subdivision (1) of this section, a child under the age of ten who is alleged to be a victim of an offense under sections ... 566.060 ... RSMo, shall be considered a competent witness and shall be allowed to testify without qualification in any judicial proceeding involving such alleged offense. The trier of fact shall be permitted to determine the weight and credibility to be given to the testimony;

...."

there is no way we could have a fair trial. We move for mistrial.

THE COURT: Motion for mistrial is overruled. I will ask them to disregard any testimony as to [the middle boy].

[PROSECUTOR]: You have already given them the instruction as to [the youngest boy].

THE COURT: Yes.

[PROSECUTOR]: I'm not sure that she testified as to anything [the middle boy] said.

THE COURT: I will tell them to disregard it anyway. That's the safer course."

When proceedings resumed in open court, the trial court stated, "The jury is directed to disregard any statements made concerning the testimony of [the middle boy]."

In the opening paragraph of his point V, appellant, as we have seen, avers that the trial court allowed the mother to testify as to what her children told her regarding what had occurred. It is manifest from the record, set forth *supra*, that the only child ever quoted by the mother at trial was the youngest boy. True, the mother testified she had a conversation with the middle boy when she and Deronda Greer picked him up at school, but the mother disclosed nothing that was said. As to the eldest boy, the mother testified that when she asked him about appellant, the eldest boy began crying. The prosecutor immediately cautioned the mother not to reveal anything the eldest boy may have said, and the mother followed that admonition.

Consequently, appellant's point V boils down to that segment of the mother's testimony in which she quoted the youngest boy, and that segment of the mother's testimony in which she revealed that the eldest boy started crying when she asked him about appellant. We deal first with the mother's testimony as to what the youngest boy told her.

Subparagraph "a" of appellant's point V, quoted *supra*, contends that inasmuch as the count accusing him of committing sodomy with the youngest boy was "nolle prossed," the mother's testimony as to what the youngest boy said to her "constituted an impermissible reference to a prior crime."

While it is doubtful that the youngest boy's revelations to the mother reached the level of evidence of a "prior crime," we need not decide that question. That is because appellant, at trial, did not object that the mother's testimony as to what the youngest boy told her amounted to evidence of a "prior crime." The only objection voiced by appellant's counsel was that the mother's recital of what the youngest boy had said was hearsay.

■ An assignment of error on appeal regarding the admission of evidence at trial must be based upon the theory stated in the objection at trial, and an accused cannot expand or change on appeal the objection as made. *State v. Franks*, 685 S.W.2d 845, 848[7] (Mo.App.1984); *State v. Cannady*, 660 S.W.2d 33, 37[6] (Mo.App.1983). As the theory advanced by appellant in subparagraph "a" of point V was not articulated in his trial objection, he is foreclosed from asserting it on appeal.

That leaves us with subparagraph "b" of appellant's point V which, as we read it, presses the hearsay objection made by appellant at trial. We point out that subparagraph "b" complains only about statements of the middle boy and the youngest boy. The eldest boy is unmentioned.

As to the youngest boy, the record (quoted earlier) shows that no objection was made by appellant's counsel until the mother testified she asked the youngest boy the color of appellant's truck. At that juncture, appellant's counsel objected, and the objection was overruled. The mother thereupon testified that the youngest boy said appellant's truck was red. The mother then testified she asked the youngest boy whether appellant did anything to him, but the youngest boy said only that the eldest boy and the middle boy knew.

During the ensuing bench conference, appellant's counsel, as we have reported, requested the trial court to instruct the

jury to disregard the mother's testimony as to what the youngest boy said. The trial court did so. No further relief was requested by appellant.

Appellant now asserts, in the statement of facts in his brief, that he moved for a mistrial because of the testimony of the mother as to what the youngest boy and the middle boy had said. In making that assertion, appellant, either intentionally or inadvertently, misstates the record. The excerpts from the transcript set forth *supra* indisputably demonstrate that the request for a mistrial was, as appellant's counsel said *at trial*, "based upon the testimony of [the middle boy], of recital of the testimony and what [the middle boy] would have said." As the mother never testified to anything the middle boy said, one wonders what appellant's counsel was referring to when he asked for a mistrial. The answer, we suspect, is that the prosecutor, in his opening statement, must have outlined for the jury what he expected the testimony of the middle boy would be.[3] Our supposition is buttressed by the fact that the request for mistrial came immediately after the hearing at which the trial court ruled that the middle boy could not testify.

■ In any event, it is clear that the mother never informed the jury of anything the middle boy had told her. There was, accordingly, no basis for a mistrial on that account. It is equally clear that no mistrial was ever requested because of the mother's testimony about what the youngest boy had told her. Appellant's counsel did, as we have observed, ask the trial court to instruct the jury to disregard the mother's testimony as to what the youngest boy said, and the trial court did so. Appellant's counsel requested nothing more. Having been granted all the relief asked for in regard to that segment of the mother's testimony, appellant cannot now complain that a mistrial should have been

declared. *State v. Allen,* 429 S.W.2d 697, 698–99[1] (Mo.1968).

■ Moreover, the only statements attributed by the mother to the youngest boy after the objection by appellant's counsel were the statements that the color of appellant's truck was red, and that the eldest boy and the middle boy knew what appellant had done to the youngest boy. The eldest boy and three defense witnesses testified that appellant drove a red pickup truck, therefore the mother's testimony that the youngest boy stated appellant's truck was red could hardly have harmed appellant. The eldest boy, as we shall see *infra,* testified *without objection* about what appellant did to the youngest boy. In view of that, we find no prejudice to appellant in the mother's testimony that the youngest boy told her the eldest boy and the middle boy knew what appellant had done to him.

There is, accordingly, no merit in subparagraph "b" of appellant's point V.

■ In oral argument before us, appellant's present counsel complained about the mother's testimony that the eldest boy started crying when she asked him about appellant. No objection was registered at trial to the mother's testimony that the eldest boy began crying, and no mention of the matter appears in appellant's motion for a new trial. Consequently, the matter is not before us for review. *State v. Haslip,* 583 S.W.2d 225, 229[14] (Mo.App.1979); *State v. Sykes,* 559 S.W.2d 643, 645[2] (Mo. App.1977).

Before considering any further assignments of error, we should summarize the remainder of the State's evidence, as one of appellant's contentions is that the evidence was insufficient to support the verdicts.

The only witness presented by the State besides the mother was the eldest boy. He unequivocally identified appellant at trial, and testified that appellant "used to live" on Dye Street "[a]cross from Deronda."

---

**3.** We cannot confirm our suspicion because the transcript does not contain the prosecutor's opening statement.

Asked to describe the first time that appellant did anything to him or his brothers, the eldest boy related that he and his brothers were playing "kickball" in their backyard and the ball was kicked into some high weeds nearby. The eldest boy went after the ball. Then, this:

"Q What happened while you were looking for your ball?

A Charlie came by and grabbed me.

Q Where did he grab you?

A He twisted my arms.

Q Did he say anything to you?

A No.

Q What did you do?

A I told [the middle boy] and [the youngest boy] to go back in the yard. I told [the youngest boy] to go get Mom. And Charlie said for me to tell [the youngest boy] to come back.

Q Charlie told you to holler at [the youngest boy]?

A Yes.

Q What were you supposed to say to [the youngest boy]?

A 'Come back.'

Q What did you do?

A Then I kicked him in the leg.

Q Then what happened?

A Then I started running.

Q Did he let go of you then?

A Yes.

Q Where did you go?

A Home.

Q Did you see Charles any more that day?

A Yes.

Q Where did you see him?

A In the back yard.

Q The same day?

A Yes.

Q What happened then?

A He told me if I ever told anybody I seen him, he would kill me and take me out of Sikeston.

Q Was [the middle boy] and [the youngest boy] there when he told you that?

A No.

Q Was that right after he had grabbed you by the arm?

A About five hours.

Q About five hours?

A After.

Q Do you think it was the same day?

A Yes.

Q Did you tell your mother about what happened?

A No."

The eldest boy testified that the next time he saw appellant was in May, 1984. On that occasion, the eldest boy and the middle boy were on the former's bicycle, going to "ball practice." The eldest boy testified:

"[Appellant] came up behind us like he was going to run over us.

Q Was he driving a car or on a bicycle?

A Red pickup truck.

Q Was he by himself?

A No.

Q Somebody with him?

A Yes.

Q Did you know who was with him?

A Mike.

Q Did you know who Mike was?

A No.

. . . . .

Q What happened when he drove up behind you?

A He stopped and I stopped. He got out of the truck and he came over and—

. . . . .

Q Were you right there on the street or were you off the street?

A Beside the street.

Q What did you do when you stopped the bicycle?

A I was crying.

Q What was [the middle boy] doing?

A Crying.

Q Then what happened when Charles came over?

A He unzipped [the middle boy's] pants and played with his privacy.

Q Did you see him play with it?

A Yes.

Q When you say that he played with [the middle boy's] privacy, what are you talking about?

A Penis.

Q What caused him to stop?

A I said 'Stop.'

Q You told him to stop?

A Yes.

Q Were you crying?

A Yes.

Q Was [the middle boy] crying?

A Yes.

Q Once he stopped, what did he do?

A He said, 'Mike, come over,' and Mike said, 'No.' He never got out of the truck.

. . . . .

Q Then what happened?

A Charlie started cussing Mike out.

Q Then what happened?

A [The middle boy] started buttoning his pants and he got on the bike and I started. We went to the complex and he started throwing rocks at us and he hit [the middle boy] in the back.

Q Did you go on to the complex and have ball practice then?

A Yes.

Q Did you see Charlie any more that day? Do you remember?

A No."

The eldest boy testified that the next time he saw appellant was "in the middle of May," 1984. The eldest boy was on his bicycle, going to the home of a friend. Then, this:

"Q What happened on the way to [the friend's] house?

"A Charlie come, stopped me.

"Q What was Charlie driving that day?

"A Red pickup truck.

"Q Was he by himself?

"A Yes.

"Q How did he get you to stop?

"A Honked the horn.

"Q You just pulled off to the side of the street?

"A Yes.

"Q Where were you, do you know?

"A Mini storage building.

. . . . .

"Q What happened when he stopped?

"A He told me to go behind the mini storage building, that he had something to show me.

. . . . .

"Q Did you do that?

"A Yes.

. . . . .

"Q What happened when you got beside the mini storage building?

"A He touched me through my clothes.

"Q Where did he touch you?

"A My penis.

"Q What did he touch you with?

"A Hand.

"Q He say anything to you?

"A He was laughing.

"Q What did you do when he did that?

"A Cried.

"Q Did you stand there or what?

"A I was hitting him.

"Q What were you hitting him with?

"A My hand.

"Q Then what did you do?

"A He wanted me to—he unzipped his pants and wanted me to put his penis in my mouth.

"Q Did you do that?

"A No.

. . . . .

"Q What did you do then?

"A I picked up the stick and hit him.

"Q Do you remember where you hit him?

"A Leg.

. . . . .

"Q Then what did you do?

"A I got on my bike and went home.

. . . . .

"Q Did you tell your mother what happened?

"A No.

"Q Why didn't you tell your mother?

"A I was scared.

"Q What were you scared of?

"A He would kill me, take me out of Sikeston.

"Q Did you see Charlie any more than day?

"A Yes.

"Q When did you see him that day again?

"A After supper.

"Q Where was it that you saw him?

"A On Dye Street.

"Q Who was with you?

"A Me and my brothers,....

"Q What were you doing?

"A Walking.

"Q Was it dark?

"A No.

. . . . .

"Q Now, is that pretty close to your house, Dye Street?

"A Yes.

"Q Tell me what happened when you walked down Dye Street.

"A We was walking and Charlie said, 'Will you come here and play with some toys?' He said—He asked us to go play with some of Donnie's toys.

"Q Who is Donnie?

"A Patsy's son.

"Q Now, was Charles walking down Dye Street?

"A No.

"Q How did he come up on you there on Dye Street?

"A He was in his yard.

. . . . .

"Q Where were those toys?

"A In the shed.

"Q Where is that shed?

"A Behind Charlie's house.

"Q Did your brothers do anything or did you do anything?

"A They went in the shed and I stayed at the door.

"Q Did you see what was going on in the shed?

"A Yes.

"Q What did you see in the shed?

"A Charlie is telling them to pull their pants down.

"Q Did they do that?

"A Yes.

"Q What were they doing?

"A Playing; and he pulled their pants down. They was crying.

. . . . .

"Q Did you see anything else happen?

"A Yes.

"Q What did you see?

"A He stuck a stick up their butts.

. . . . .

"Q What were [the middle boy] and [the youngest boy] doing?

"A Crying.

"Q What happened after he did that?

"A Charlie unzipped his pants and said, 'Put this in your mouth,' and there was white stuff on it, and he put it in his mouth and [the middle boy] started gagging.

. . . . .

"Q Then what happened?

"A Then they put their pants on. [The middle boy] hit him in the leg and they put their pants back on and they ran back. We ran back home.

"Q Did you tell your mother what happened?

"A No.

"Q Why didn't you tell her?

"A I was scared.

"Q Okay; did you see Charles any more?

"A Yes.

"Q When did you see him after that?

"A On Saturday.

. . . . .

"Q How do you know it was a Saturday?

"A Because we was out of school.

. . . . .

"Q Do you remember what month that was?

"A May.

"Q What year was it?

"A 1984.

"Q Where did you see Charles at that day?

"A In the red pickup truck.

"Q Was he by himself?

"A Yes.

"Q Where were you?

"A Me and [the middle boy] and [the youngest boy] were walking to the park.

. . . . .

"Q What happened that day?

"A He got out of the truck and put [the youngest boy] in the truck and asked [the middle boy] if he wanted some beer. And [the middle boy] dropped his head, and he got a cup out of the truck and went around and used the bathroom and gave it to [the middle boy].

"Q Did you see him do that?

"A Yes.

"Q Then what happened?

"A I pushed the cup out of [the middle boy's] hand before he could put it in his mouth.

"Q Then what happened?

"A The cup broke and he started cussing. He let [the youngest boy] out of the truck and he left.

"Q Did you see him any more that day?

"A No.

"Q Did you ever tell your mother all these things?

"A No.

"Q Have you told her all these things since then?

"A Yes."

On cross-examination, the eldest boy testified that the day his mother picked him up at school and took him to the police station was "about a week after this happened."

Appellant's point X maintains that the uncorroborated testimony of the eldest boy was insufficient as a matter of law to support the convictions, in that such testimony "was riddled with contradictions as to the dates of the alleged incidents." In the argument under point X, appellant sets forth a number of alleged contradictions, many of which are unaccompanied by a reference to the legal file or transcript.[4] The reason may be that, according to appellant, some of the contradictions are between the eldest boy's testimony at trial and his testimony at the preliminary hearing, and other alleged contradictions are between the eldest boy's testimony at trial and a statement he gave to a police officer. The record supplied us contains neither a transcript of the eldest boy's testimony at the preliminary hearing nor a copy of his statement to the officer.

We have nonetheless endeavored to study each alleged contradiction appearing in the record on appeal. At one point during cross-examination, the eldest boy fixed the date of the first encounter with appellant (the kickball incident) as Wednesday, May 16, and fixed the date of the second encounter (the confrontation on the way to the ball park during which appellant was accompanied by "Mike") as "Saturday" (inferentially the first Saturday after the kickball incident). The eldest boy further testified on cross-examination that the date of his third encounter with appellant (the one where he was taken behind the "mini

---

4. Rule 30.06(h), Missouri Rules of Criminal Procedure (17th ed. 1986), which pertains to appellate briefs, states: "All statements of fact and argument shall have specific page references to the legal file or the transcript."

storage building") was Sunday, the day after the confrontation en route to the ball park. The fourth encounter (the incident in the shed) was, according to the eldest boy, later the same day as the third encounter.

In subsequent cross-examination, the eldest boy, as we comprehend his testimony, testified that the shed incident was on a Friday, and that the final encounter (in which appellant "used the bathroom" in a cup and handed it to the middle boy) was on "Saturday." After that, however, the eldest boy testified he could not remember the day of the week that the shed incident occurred, explaining, "It's been a long time."

Appellant argues that the "contradictory nature of the dates in this case leaves a cloud of doubt over the alleged events." In support of that proposition, appellant cites *State v. Johnson*, 595 S.W.2d 774 (Mo.App.1980), a prosecution for sodomy and rape. That case does not aid appellant. There, the victim's trial testimony conflicted in some respects with a prior statement she had given the police. Finding the evidence sufficient to sustain the conviction, the court said:

"The testimony of the victim is not considered to be 'clouded with doubt' or 'extremely doubtful' ... merely because she falls into inconsistencies or contradictions as to minor points of a nonessential nature. In the present case, all of the matters of which defendant complains relate to relatively unimportant details. No discrepancy appears as to the essential elements of the crimes of rape and sodomy." *Id.* at 776[3, 4].

Appellant, however, contends that in the instant case, time is "an essential element," especially in light of his alibi defense. In that regard, appellant presented testimony from several witnesses accounting for his whereabouts from the morning of Thursday, May 17, 1984, until Saturday afternoon, May 19. Appellant argues that "any element which would negate a defense cannot be a relatively unimportant detail." In support of that assertion, appellant refers us to *State v. Mazzeri*, 578 S.W.2d 355

(Mo.App.1979), and *State v. Bursley*, 548 S.W.2d 586 (Mo.App.1976). Neither case is relevant, as there was no reliance by the accused on an alibi in either.

■ We find nothing inconsistent or contradictory in the eldest boy's testimony regarding the essential elements of the crimes for which appellant was convicted, and nothing about the eldest boy's testimony leaves our minds clouded with doubt of appellant's guilt. We hold the testimony of the eldest boy sufficient to support the verdicts. *State v. Presley*, 694 S.W.2d 867 (Mo.App.1985). Appellant's point X is, accordingly, denied.

We turn now to appellant's point I, a prolix point in which appellant insists that the trial court committed prejudicial error in denying appellant's day-of-trial motions to strike the amended informations and his day-of-trial motions for bills of particulars. Appellant contends that by allowing the State to "expand the time period" from one day to 24 days, the trial court "significantly denied the [appellant] the use of his alibi defense."

In *State v. Moore*, 642 S.W.2d 917 (Mo. App.1982), the information charged that the crime, conspiracy to commit first degree robbery, occurred "on an unknown day in January 1980." The court held that this span of time did not place an impossible burden on the accused "as to the offer of evidence of his whereabouts over a period of time." *Id.* at 923.

Appellant directs us, however, to *State v. Bowles*, 360 S.W.2d 706 (Mo.1962), a conviction for molesting a minor. There, the information alleged the crime occurred on or about December 1, 1959. The victim testified that the accused molested her several times during the month of December, 1959, as well as at other times prior thereto. She recalled one incident on December 1 and another incident after Christmas, during the Christmas vacation. The verdict-directing instruction authorized a finding of guilty if the jury found that the accused, on or about December 1, 1959, or at any time within three years next before June 10, 1960, molested the victim. The

accused introduced evidence supporting an alibi for December 1, 1959, and for the Christmas vacation, 1959. The court held the instruction was prejudicially erroneous, as it nullified the accused's alibi defense.

Appellant also relies on *State v. Clark*, 509 S.W.2d 740, 743 (Mo.App.1974), where it is said that when an alibi is interposed, the time span within which the crime is alleged to have occurred must not be such as to place an impossible burden on the accused to offer evidence of his whereabouts over an extended period of time.

■ Applying the principles of *Moore*, *Bowles* and *Clark*, we cannot convict the trial court of error in denying appellant's motions to strike the amended informations. Appellant's evidence established that in the month of May, 1984, he was in Sikeston daily, Monday through Friday, except the period May 17 to 19. Appellant's mother testified he was residing with her during that month; other evidence established that they lived near Whitewater, Missouri. According to appellant's mother, appellant was attending "cooking school" in Sikeston. He would go to Sikeston each Monday morning, return home Wednesday evening, go again Thursday morning, and return Friday evening. On Mondays, Tuesdays, and Thursdays, appellant stayed all night in a Sikeston business office owned by friends.

It thus appears that except for Saturdays and Sundays—and May 17 to 19—appellant's own evidence placed him in the community where the alleged crimes occurred. Appellant does not tell us, and the record does not demonstrate, that he could have supplied an alibi for any days other than those already noted.

Additionally, while the period covered by the amended informations was May 1 to May 24, the State's evidence showed that May 23 was the last day the crimes could have occurred, as the phone call to the mother that prompted the investigation came at 1:00 a.m., May 24.

The 23-day period here was a shorter time than the 31-day period upheld in *Moore*. Additionally, it is manifest from the eldest boy's testimony that the State could not have been any more specific as to the dates of the alleged offenses. The eldest boy was extensively examined and cross-examined, and he was unable to narrow the time span to a period shorter than 23 days.

Were we to hold that the trial court should have stricken the amended informations, we would be effectively barring appellant's prosecution for the crimes established by the State's evidence. Nothing in the record before us compels such a result. The trial court did not err in denying appellant's motions to strike the amended informations.

■ The same rationale applies to the trial court's denial of appellant's motions for bills of particulars. It is obvious from the testimony of the eldest boy that the State could not have supplied appellant any date for the alleged crimes more precise than May 1 to May 24, 1984. In *State v. Allen*, 622 S.W.2d 275 (Mo.App.1981), a prosecution for sexual abuse in the first degree, the accused filed a motion for a bill of particulars asking for the specific dates upon which the alleged conduct occurred. The State responded that the specific dates of occurrence were unknown, as the victim, a 6-year-old child, could state only that the criminal acts occurred frequently between January 1, 1979, and July 1, 1979, when the victim's mother was not home. The indictment was held sufficient. *Id.* at 276[1]. Denial of appellant's motions for bills of particulars in the instant case was not error.

Appellant also avers in point I that allowing the State to "expand the time period" denied him the opportunity for a preliminary examination. That contention overlaps appellant's point II, which asserts that the trial court erred in denying appellant's request that the cases be remanded for another preliminary hearing. We therefore shift our attention to point II. In that point, appellant argues that the amended informations broadened the time span to such an extent that it was "tantamount to

either a new crime charged, or at least such a material change as to require a new preliminary hearing." This is especially true, says appellant, when the defense of alibi was interposed.

Appellant cites five cases in support of point II, but in only one, *State ex rel. Buresh v. Adams,* 468 S.W.2d 18 (Mo. banc 1971), was there a holding that a new preliminary hearing was required. There, a preliminary hearing had been held on a two-count complaint. One count charged the accused (the general manager of an electric cooperative) with embezzling $870 from his employer between July, 1966, and October, 1968, by falsifying business expense accounts. The other count charged that the accused converted electricity from his employer to his personal use between July, 1959, and January, 1969. The accused was bound over for trial on the *first count only.*

The prosecutor thereafter filed an information charging the accused with stealing from his employer in a continuous scheme between July, 1959, and January, 1969, by submitting false claims for alleged travel expenses and then approving them, by having goods, wares and merchandise delivered to his personal home for his own use and directing the suppliers to bill the items to his employer, by having his employer's workers perform labor and services on his personal residence, and by using, in his personal residence, electricity supplied by his employer without having himself billed for it. The accused brought a prohibition proceeding to bar prosecution on the ground that no preliminary hearing had been held on the offense charged in the information.

The Supreme Court agreed, noting that the information expanded the time within which the alleged acts occurred to about 9½ years, and that the information charged the accused with criminal acts in addition to those for which he had been bound over. One of those additional acts, stealing electricity by converting it, was the same one on which the magistrate had earlier refused to bind the accused over.

In the instant case, the crimes for which appellant was convicted were the identical crimes on which his preliminary hearing was conducted. The only difference between the complaints in the associate division of the circuit court and the amended informations was that the complaints alleged the crimes were committed on or about May 17, 1984, while the amended informations alleged the crimes were committed between May 1, 1984, and May 24, 1984.

Rule 23.08, Missouri Rules of Criminal Procedure (16th ed. 1985), provides:

"Any information may be amended or substituted for an indictment at any time before verdict or finding if no additional or different offense is charged and if a defendant's substantial rights are not thereby prejudiced. No such amendment or substitution shall cause delay of a trial unless the court finds that a defendant needs further time to prepare his defense by reason of such amendment or substitution."

■ When the date of the commission of an offense is not essential to the crime charged, amendment of the date on which the crime is alleged to have been committed lies within the trial court's discretion, which will not be disturbed absent an affirmative showing of prejudice. *State v. Snyder,* 502 S.W.2d 339, 342[2] (Mo.1973); *State v. Wakefield,* 682 S.W.2d 136, 144–45[13] (Mo.App.1984).

It must be remembered in the instant case that the amended informations were not filed on the day of trial. As noted early in our opinion, the State's motions for leave to file the amended informations were filed May 15, 1985. Copies of the amended informations were sent that date to appellant's counsel by an assistant prosecuting attorney. On May 28, 1985, the circuit clerk sent appellant's counsel a letter advising that the trial court had, on May 24, 1985, granted the State leave to file the amended informations. At that time, appellant's counsel knew that the cases were set for trial June 24, 1985.

At no time after May 28, 1985, did appellant seek a continuance, nor did he indicate that he needed time for additional discovery or trial preparation. Indeed, as mentioned earlier, the trial court, after denying appellant's motions to strike the amended informations, inquired whether all discovery was finished. Appellant's counsel replied yes.

As we see it, the only thing appellant would have gained from another preliminary hearing would have been another opportunity to question the eldest boy under oath. That is not the purpose of a preliminary hearing. The sole purpose of a preliminary hearing is to determine whether a felony has been committed and whether there is probable cause to believe that the felony was committed by the accused. *State v. Patrick*, 420 S.W.2d 258, 263[2] (Mo.1967); *State v. Worley*, 383 S.W.2d 529, 532–33[5] (Mo.1964); Rule 22.-07(c), Missouri Rules of Criminal Procedure (16th ed. 1985). While an incidental byproduct of a preliminary hearing may be the eliciting of testimony from witnesses for the purpose of impeaching them at trial, such is not the reason for a preliminary hearing. *Nero v. State*, 579 S.W.2d 638, 639[2] (Mo.App.1979).

Appellant argues that permitting the State to broaden the period during which the crimes were alleged to have been committed allowed the jury to convict him even though the jury found his alibi credible. He does not, however, explain how a second preliminary hearing would have altered that circumstance, and we fail to see how it could have. Moreover, as emphasized above, the purpose of a preliminary hearing is not to provide the accused a forum for discovery. There are rules designed for that. Rule 25.01 *et seq.*, Missouri Rules of Criminal Procedure (16th ed. 1985).

The trial court did not err in denying appellant's verbal request for another preliminary hearing. Appellant's points I and II are denied.

The next assignment of error we consider is appellant's point VI, which concerns his counsel's efforts, during cross-examination of the eldest boy, to make use of the "transcript" of the preliminary hearing.

The record shows that appellant's counsel read aloud to the eldest boy certain questions and answers from a document, and asked the eldest boy if he had given those answers at the preliminary hearing. The prosecutor objected on the ground that the document had not been identified. Appellant's counsel replied that the document was "a transcript of the testimony at the preliminary hearing furnished me by the associate circuit court's office."

The trial court pointed out: "The Court doesn't have a copy of it or the prosecutor doesn't have a copy. Nobody has a copy but you. See what I mean? Nobody can track what you are saying. If you leave out a sentence, nobody in the room would know it. Not that you would, counsel."

At that point, appellant's counsel embarked on another line of questioning, without pursuing the inquiry regarding the eldest boy's testimony at the preliminary hearing. Some 100 questions later, however, appellant's counsel stated, "Judge, I want to direct your attention to page 9 of the transcript."

The prosecutor thereupon requested a hearing outside the presence of the jury. During that hearing, the prosecutor objected to the use of the document, stating: "There has been no evidence showing that this correctly represents the words that were on the tape at that time. I don't know who prepared it. I don't know where the tape has been or whether, in fact, this is the whole sum and substance of that hearing."

Appellant's counsel, outside the hearing of the jury, presented the testimony of an "associate circuit clerk," who identified a tape as the record of the preliminary hearing. The clerk disclosed that an employee of appellant's counsel "transcribed" the tape, but the clerk did not "verify" the transcription.

The trial court then directed the attention of appellant's counsel to one page of the transcript where there were two "uh-

uhs" followed by a "no" in parentheses. That, said the trial court, was "an interpretation of whoever typed this document."

The court's remark prompted appellant's counsel to move for a mistrial on the ground that "we don't have what the Court would deem the official transcript before us." Appellant's counsel asked "to come back at a later date with an official certified transcript that the Court could go by, because it jeopardizes our man's position if we don't have an opportunity to cross-examine this young witness on what he has said before as to the dates and occurrences and inconsistencies that he has said in various statements."

After further colloquy between the trial court and counsel, the court stated: "I am prepared to allow you to utilize this document if you will tell me, this is the third time I have asked you, if you will show me precisely where you would like to use it and how.... If you want to use it, simply now show me where in this document you wish to use it and I may allow it.... If you wish to use it to impeach, show me where and I will permit it if it is a contradiction."

After that comment, there was a lengthy discussion about whether certain testimony given by the eldest boy at the preliminary hearing did indeed contradict his trial testimony. At the end of that exchange, the trial court said, "For the record, I will let you use that record to show any impeachment you want to show that is relevant, but whether the boy understands questions asked by adults that the Court doesn't understand, I am not going to spend all afternoon doing that."

Appellant's counsel then presented testimony from a "legal secretary" formerly employed by him. The secretary testified she transcribed the tape of the preliminary hearing, and she identified the document in question as the transcription. She conceded that there were places where the tape was "inaudible," and she further revealed that the answers "uh-huh" and "uh-uh" frequently appeared on the tape instead of "yes" or "no." As we understand

her testimony, the secretary, in preparing the transcript, began substituting "no" for "uh-uh" when she heard that utterance on the tape.

The trial court and counsel for both sides then embarked on a tedious interrogation of the secretary regarding her preparation of the transcript. At the conclusion of that exercise, which fills 15 pages of the record, the trial court stated: "Gentlemen, again my offer still holds: if you want to use that document, I will permit its use if you will show me specifically what you want to use in it. You will have to mark it out for me. I will not deprive you of the use of it, but I will have to see it first."

The cross-examination of the eldest boy then resumed in open court. Appellant's counsel made no further reference to the document, nor did he identify for the trial court any part thereof that he desired to use.

Appellant's point VI states:

"The trial court committed prejudicial error in not remanding the case for a preliminary hearing on the amended informations filed by the State in light of the court's ruling that the transcript from the prior preliminary hearing could not be used for cross-examination purposes in the cross-examination of [the eldest boy] and as a result thereby the [appellant] was significantly prejudiced."

It is manifest from those portions of the record mentioned above that the trial court did not rule that the "transcript" of the preliminary hearing could not be used for "cross-examination purposes." The trial court insisted only that appellant's counsel point out what segments of the "transcript" counsel desired to use for impeachment. Appellant's counsel made no attempt thereafter to utilize any part of the "transcript" in cross-examining the eldest boy.

Appellant does not cite us to anyplace in the record that shows the trial court prevented him from impeaching the eldest boy's trial testimony by an inconsistent statement at the preliminary hearing.

Point VI, in sum, is another instance where the assignment of error, either deliberately or unwittingly, misstates the record. Point VI is patently without merit.

Point VII avers the trial court erred in refusing to receive in evidence "records of the Sikeston Public Safety Department," as such records contained "prior inconsistent statements made by the alleged victims." This contention, like appellant's earlier ones, requires an examination of the record.

One of the witnesses presented by appellant was Bryan Q. Crites, a criminal investigator for the Sikeston Department of Public Safety. He appeared at trial with the "case file" regarding the charges against appellant. Crites disclosed that while he never questioned any of the boys, he nonetheless recognized a written statement (Exhibit A) taken by his secretary May 24, 1984, from the eldest boy. Crites explained that his secretary, "in the usual course of her business, was authorized to take statements." He added, however, that he had no idea whether the statement his secretary took from the eldest boy was "taken in accordance with the authority she had to take statements."

The statement, Exhibit A, was not offered in evidence during Crites' testimony.

Later, after appellant had presented the testimony of the next witness (his tenth), the trial court stated, "Next witness . . . . ?" Appellant's counsel replied: "I think that's all, Your Honor. I am going to offer into evidence those exhibits. *A is the police record, we just wanted that marked. We are not going to offer it.*" (Emphasis added.)

The trial court thereupon received in evidence three other defense exhibits.

 The vacuity of point VII is apparent from the record. As appellant never offered Exhibit A in evidence, the trial court had no occasion either to receive or reject it. Appellant cannot, therefore, in-dict the trial court for error. *Findley v. Johnson,* 142 S.W.2d 61, 67[11] (Mo.1940).

Moreover, we have carefully studied the cross-examination of the eldest boy by appellant's counsel. Nowhere in the cross-examination did appellant's counsel ask the eldest boy about a specific statement made by the eldest boy to investigator Crites' secretary.

 One seeking to impeach a non-party witness must lay a foundation by asking the witness whether he made the prior statement, quoting it and the precise circumstances under which it is made. If the witness admits making the statement, he stands impeached. If the witness denies or equivocates about having made the statement, the examiner may then introduce evidence showing the witness did make the prior inconsistent statement. *State v. Franks,* 685 S.W.2d 845, 850[15] (Mo.App.1984); *Engelbert v. Flanders,* 670 S.W.2d 19, 21[1] (Mo.App.1984). That procedure was not followed by appellant's counsel in the instant case. Consequently, even if we assume Exhibit A contained one or more statements by the eldest boy inconsistent with his testimony at trial,[5] the trial court would not have erred in rejecting it, had it been offered. Appellant's point VII is destitute of merit.

In point VIII, appellant asserts the trial court erred in refusing to receive in evidence "the records of the Ferguson Medical Group and in particular those of Dr. Pfefferkorn." This complaint has the following origin.

Appellant called as a witness Dr. Thomas J. Harrison, Jr., who, it will be recalled, examined the three boys on May 24, 1984. Dr. Harrison testified he obtained "rectal smears" from each boy for the purpose of a "gonozyme test, which is a test for gonorrhea." The tests on the middle boy and the youngest boy "came back positive." A similar specimen was obtained from appellant and, according to Dr. Harrison, the

---

5. Appellant failed to include Exhibit A in the record on appeal, thus we do not know what it contained.

"rectal gonozyme on Mr. Woods was positive." Then, this:

"Q Did Dr. Pfefferkorn indicate in his records that he felt that that was any indication of any venereal disease?

[PROSECUTOR]: Your Honor, I object at this point, because I believe we have jumped into hearsay of Dr. Pfefferkorn at this point.

THE COURT: Objection sustained."

Appellant's counsel thereupon undertook to establish that the records brought to court by Dr. Harrison were "maintained in the usual course of business" by the Ferguson Medical Clinic, where Dr. Harrison practiced. Then, this:

"Q What does the record show as to Dr. Pfefferkorn's diagnosis?

A I can read the record. Again, I am not certified to care for adults, so when you ask about whether we cover for each other, I would cover for another pediatrician, but I do not usually cover for another internist and, of course, Dr. Pfefferkorn is an internist. Do you want me to read?

[PROSECUTOR]: I want to object to the hearsay nature.

THE COURT: Objection sustained."

At that point, appellant's counsel requested, and was granted, a side-bar conference, during which he said, "He's testified these records were made in the usual course of business and they are in the clinic, and all I want him to say is that the gonozyme is positive, and he's going to explain what a gonozyme is."

The trial court opined that appellant's counsel had not asked Dr. Harrison "the necessary questions to qualify as a business record." After further discussion, appellant's counsel said, "The gonozyme on Charles turned out positive, as did the rectal test they did on [the middle boy] and [the youngest boy]; but, as he explained, those gonozyme tests are tests that can often be caused by two other bacteria in the rectum."

The trial court replied that he could not allow Dr. Harrison to "testify what another doctor's opinion is."

Proceedings then resumed in the presence of the jury. Appellant's counsel asked Dr. Harrison to explain what a gonozyme test is. Dr. Harrison testified:

"A gonozyme is a test to detect the presence of gonorrhea, which is Neisseria gonorrhoeae, a bacteria. The test is based on—it is not truly a culture; in other words, the bacteria was not grown. It is a more rapid way of determining the presence of the bacteria by detecting the antigen, which is a substance that the bacteria would produce.

The way it works is a swab is taken from the patient and it's then incubated with an enzyme or with some beads, which if there is bacteria present, the bacteria will then attach to these beads. The beads are then washed to wash away other things that might contaminate it and are then exposed to an antibody which would then attach to the beads.

And then an enzyme is mixed in so that there is produced a color change if there are antigens from that bacteria present. The color change then is read by what's called a spectrophotometer to determine if there is enough of the antigen from that bacteria present to be a significant difference from a control, the difference between that and a culture. The culture is the way it was previously done, and I will mention that we did also a culture on this patient, too.

The difference is the gonozyme just detects antigens present. The bacteria does not actually grow. It can be determined within a few hours, whereas the culture generally takes two to three days to grow.

Q Now, you did the cultures?

A Yes, sir.

Q And they showed—

A The cultures were negative.

Q Now, are there other bacteria in and around the rectum that can sometimes cause a false reading?

A Yes, sir. There are two particular bacteria, both of them Neisseria species, which can interfere on rectal swabs, and honestly, for that reason, generally the gonozyme is not used on rectal swabs. It's more specific for urethral or for cervical or vaginal test on the female.

Q Did you later make a final diagnosis?

A Yes, sir.

Q And what was that?

A After the cultures came back, my diagnosis was that there was not venereal disease present."

Appellant's counsel thereafter made no offer to prove that the "records" prepared by Dr. Pfefferkorn would have shown anything beyond what was established by Dr. Harrison's testimony. On appeal, appellant's present counsel likewise makes no such offer. Instead, counsel argues that because the trial court forbade Dr. Harrison from testifying as to the opinion of Dr. Pfefferkorn, the "prior inconsistent statements given to Dr. Harrison could not be explored by the [appellant] and [he] was prejudicially harmed."

Appellant does not tell us what those "prior inconsistent statements" were, nor does he supply a clue as to how the trial court's ruling prevented *Dr. Harrison* from testifying about any alleged inconsistent statements made to him by the eldest boy.

Indeed, Dr. Harrison testified that the eldest boy indicated the "first episode" occurred on a Wednesday, and Dr. Harrison got the "impression" that it was "the Wednesday prior to the clinic visit." Dr. Harrison recalled that the eldest boy described "four episodes," and that the eldest boy "never mentioned a shed."

■ Additionally, when the trial court made its rulings, appellant made no mention that the rulings barred him from adducing any "prior inconsistent statements," and appellant's cross-examination of the eldest boy laid no foundation for the receipt in evidence of any statements made

by the eldest boy to either Dr. Harrison or Dr. Pfefferkorn.

Thus, point VIII, like those discussed earlier, vaporizes when exposed to the revealing light of the record. Point VIII is denied.

We now focus on point IX, which concerns one Frank Wilderness, Jr., another defense witness. Wilderness testified he was residing at 212 Dye Street in Sikeston in May, 1984. Then, this:

"Q And during the month of May, was there ever an occasion when a white man and three little boys came up and went back to the shed?

A No, sir."

Later, after six other defense witnesses had testified, appellant's counsel asked permission to recall Wilderness. Counsel stated: "This man has now revealed to us that he kept a half German shepherd, half Doberman Pinscher, tied to the garage and he slept in the garage and he is there during the entire month of May and nobody could have gotten in the garage."

An attorney assisting appellant's counsel at trial stated: "He disclosed it to me when I went out to make a phone call, and I haven't been here all day, and I walked out—and I didn't hear his testimony, and then he mentioned to me about the dog. And then I came down and told [another attorney assisting appellant's counsel] and [that attorney] told [appellant's counsel]. ... I walked out and he said, 'I have something to tell you.' He said, 'I've got this dog that was always tied to that shed, and you need to tell [appellant's counsel] about that.' ... And I asked him, 'Was the dog there throughout the whole month of May?' "

The trial court asked appellant's counsel why Wilderness had not revealed that before. Appellant's counsel responded: "I went down to his house one afternoon this week. He was on the couch asleep. I went into a place, I didn't want to stay there very long. I asked him the one question that Officer Evans had reported in his police report, that Frank Wilderness said that the man, the black man that lived

there had never observed any white guy and these three kids come up and go back to that shed, and that's the way I left it."

The trial court stated that inasmuch as the dog was not mentioned in Wilderness' direct testimony, the court would not allow appellant's counsel to present the proffered testimony at that stage in the trial.

Appellant's counsel, outside the hearing of the jury, called Wilderness to the stand to make an offer of proof. Wilderness confirmed that he had not told any of appellant's attorneys about the dog until after he testified.

The trial court asked: "Didn't you just walk up to my bailiff a while ago and say, '[Appellant's counsel] forgot to ask me about the dog'?" Wilderness answered: "No, sir. I do not want to go to jail."

The trial court then stated: "The man walked up to my bailiff and said, '[Appellant's counsel] forgot to ask me about my dog.' He is fixing to perjure himself, and I'm not going to let him testify."

Further dialogue ensued between the court and counsel, during which appellant's counsel said, in substance, that if Wilderness had earlier told him about the dog, counsel had forgotten. Then, this:

"THE COURT: When was the first time that you discussed it with the attorneys? You don't remember this or—

[WILDERNESS]: I thought I had told him and he said he didn't recollect me ever saying anything about it, so when I was up there, if I told him about it, that's when I told him, told the bailiff that, you know.

THE COURT: You told the bailiff. What did the bailiff do? Did he go get somebody for you?

[WILDERNESS]: He came out."

The attorney to whom Wilderness had spoken outside the courtroom stated: "I just walked out to make a phone call. He didn't get me." Appellant's counsel then said: "I had, on the record, if he did tell me, I had forgotten that he told me. I am not saying that the man didn't tell me, and he very well might have."

The trial court adhered to its ruling that Wilderness could not be recalled.

Appellant argues in point IX that the trial court abused its discretion in prohibiting him from recalling Wilderness, in that the testimony Wilderness would have given was "material and relevant" to appellant's case.

Appellant does not cite, and our independent research has not found, a Missouri case in which a conviction was reversed because an accused was barred from recalling a defense witness for testimony about a matter first disclosed by the witness *after* his initial appearance on the stand.

In *Brown v. Burrus*, 8 Mo. 26 (1843), one of the contentions was that the trial court erred in permitting a witness who had been examined in chief, and cross-examined, to be again called and examined in chief. The opinion said:

"The manner of examining a witness is entirely within the discretion of the court before whom the witness is produced, and that discretion must be governed, in a great measure, by a knowledge of the character of the witness, and from his demeanor during his examination. A party producing a witness who, whilst deposing, manifests intelligence, candor, and a freedom from all bias for or against either party, would be more liberally indulged than one who introduced a witness who displayed all the opposite qualities.... This discretion is to be exercised in furtherance of justice, and in a manner so as not to encourage the tampering with witnesses, to induce them to prop a cause whose weakness has been exposed.... So, material testimony ought not to be rejected, because offered after the evidence is closed on both sides, unless it has been kept back by trick, and the opposite party would be deceived or injuriously affected by it. So, after a witness has been examined and cross-examined, the court may, at its discretion, permit either party to examine him again, even as to new matter, at any time during the trial." *Id.* at 29–30.

*Brown,* of course, differs from the instant case in that here the trial court denied permission to recall witness Wilderness, whereas in *Brown* permission was granted. We cannot determine from *Brown* whether the desire to recall the witness there arose because the witness, after testifying initially, revealed information not previously disclosed.

There are, of course, Missouri cases where witnesses were recalled for the purpose of presenting testimony inadvertently omitted when they testified initially, and there is one Missouri case, *State v. Walsh,* 624 S.W.2d 526 (Mo.App.1981), where a witness, after testifying, did some additional investigation and was allowed to return to the stand and testify about it. Those cases, however, do not present the problem that confronted the trial court in the instant case.

 Here, witness Wilderness apparently told no one about the dog until after he had left the witness stand. The trial court, who had the opportunity to observe Wilderness and hear his explanation—including his denial and subsequent admission that he had told the bailiff—was doubtful of Wilderness' credibility. Additionally, we do not know whether, at the time the issue came up, the State had already released witnesses that possibly could have rebutted Wilderness' testimony about the dog. Given those factors, we cannot convict the trial court of an abuse of discretion in refusing to allow appellant to recall witness Wilderness. Point IX is denied.

 Appellant's two remaining assignments of error, points III and IV, pertain to instructions.

Point III maintains that the trial court erred in giving instruction 7, the verdict-directing instruction on sexual abuse in the first degree (designated "Count I" at trial), and instruction 8, the verdict-directing instruction on sodomy with the middle boy (designated "Count II" at trial). Point III asserts that those instructions gave the jury "a roving commission to find that the alleged offenses occurred on any date between May 1, 1984, and May 24, 1984, when the only evidence presented at trial established May 16, 1984, or May 17, 1984, and as a result the jury could believe [appellant's] alibi defense but still find [him] guilty of the offense by choosing a date or dates not in evidence."

Instructions 7 and 8 each submitted that the respective offenses hypothesized therein were committed "between May 1, 1984, and May 24, 1984." In that respect, appellant's point III is factually correct. His point III is clearly incorrect, however, in averring that the evidence established that the crimes were committed on May 16 or 17, 1984.

We observed in summarizing the cross-examination of the eldest boy that at one point he fixed the date of the first encounter with appellant—the kickball incident—as Wednesday, May 16, 1984. Appellant seizes on that, but ignores the eldest boy's testimony that the second encounter with appellant—the one on the way to the ball park when appellant was with "Mike"—was on Saturday, and the eldest boy's testimony that the third encounter—the one at the "mini storage building"—was on Sunday. Appellant also disregards the eldest boy's testimony that the fourth encounter—the shed incident—took place the same day as the third encounter, and the subsequent testimony by the eldest boy that the shed incident occurred on a Friday. Appellant also overlooks the eldest boy's eventual concession that he could not remember the day of the week of the shed incident.

The above testimony categorically refutes appellant's contention that the evidence established that the crimes occurred May 16 or 17.

Appellant's complaint that instructions 7 and 8 allowed the jury to convict him even if the jury believed his alibi defense is answered by *State v. Siems,* 535 S.W.2d 261 (Mo.App.1976). There, the information charged the accused with committing sodomy on or about February 23, 1972. At trial, the 12-year-old victim testified the

crime occurred while her mother was hospitalized from January to March 9, 1972, and that her best recollection was that it took place toward the latter part of February, possibly the last week on either a Friday or a Saturday night. The accused admitted being in the victim's house about two or three times a week during her mother's hospitalization, but presented an alibi for the last weekend in February and testified his business records could account for about 75 per cent of his time in February. The verdict-directing instruction hypothesized that the crime occurred "during the month of February, 1972." The accused contended that the instruction negated his alibi defense. Rejecting that argument, the opinion said:

"When a specific date is presented as the date of the alleged crime, an instruction covering a broad period of time may not be given which would nullify an alibi defense supported by substantial evidence. *State v. Bowles*, 360 S.W.2d 706 (Mo.1962); *State v. Chittim*, 261 S.W.2d 79 (Mo.1953). However, in this case the State did not rely on a specific day or week. The young victim, for understandable reasons, did not report the crime for about four months and could not state precisely when it occurred. Defendant acknowledged being in the victim's house two or three times a week during the month of February. We believe that the evidence in this case puts the instruction within the holding of *State v. Walker*, 357 Mo. 394, 208 S.W.2d 233 (1948), upholding a verdict directing instruction reciting that the sex crime complained of occurred 'on or about the ___ day of December 1945.' The court in *Walker* found the instruction 'sufficiently limited the time of the alleged offense, for which appellant was convicted, to the facts testified to by prosecutrix.' " *Siems*, 535 S.W.2d at 266.

Appellant in the instant case has less reason to complain than the accused in *Siems*. Here, the amended informations alleged the crimes occurred between May 1, 1984, and May 24, 1984, while in *Siems* the information alleged the crime occurred on or about February 23, 1972. Instructions 7 and 8 in the instant case therefore coincided with the period alleged in the amended informations, whereas in *Siems* the verdict-directing instruction submitted a different, and longer, time span than that charged in the information. Additionally, the verdict-directing instruction in *Siems* covered an entire month, while the verdict-directing instructions in the instant case cover only 24 days.

Appellant cites *State v. Graves*, 588 S.W.2d 495 (Mo. banc 1979); *State v. Sager*, 600 S.W.2d 541 (Mo.App.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981); and *State v. Morris*, 662 S.W.2d 884 (Mo.App.1983). Those cases, however, are factually dissimilar to the instant case. In each of those cases the State's evidence showed that the criminal activity took place on a specific date during a definite and relatively brief period of time. The accused in each case presented evidence showing that he was elsewhere during the crucial period. The verdict-directing instruction in each case submitted that the crime occurred "on or about" a particular day. The cases held it was unnecessary for the verdict-directing instruction to specify the precise hour when the crime was committed. The reason was that the cases were not ones where the jury could believe the alibi evidence and nonetheless find the accused guilty. A belief in the truth of the alibi would necessarily result in an acquittal.

That, of course, is not the situation here. The jury could have believed appellant's alibi evidence, which accounted for his whereabouts from Thursday morning, May 17, 1984, until Saturday afternoon, May 19, 1984, and could also have believed that appellant committed the crimes before or after that period. We find nothing in *Graves, Sager* or *Morris* suggesting that where the State's evidence shows a crime was committed on an unknown day in a particular month, and the accused presents evidence supporting an alibi for one or more days of such month, the accused is immune from prosecution merely because

the jury could believe the accused's alibi evidence and also believe he committed the crime. Such a rule would bar conviction anytime the State's evidence showed a crime was committed on an unknown day during a particular period, and the accused presented evidence supporting an alibi for any segment of the relevant period. *Siems* holds otherwise. Appellant's point III is denied.

The final assignment of error, point IV, pertains to instruction 9. By that instruction, the trial court undertook to advise the jurors that if they did not find appellant guilty of sodomy as charged in Count II, they should consider whether he was guilty of sexual abuse in the first degree.

The first sentence of instruction 9 read: "If you do not fi*ne* the defendant guilty under Count II of sodomy, you must consider whether he is guilty under Count II of sexual abuse in the first degree." (Emphasis added.)

Appellant's point IV states:

"The trial court committed prejudicial error in the giving of Instruction No. 9 in that the use of the word 'fine' instead of 'find' improperly instructs on a lesser included offense and, further, that it is misleading, confusing, and ambiguous in that it instructs the jury that if it did not 'fine' the [appellant] guilty under Count II it must consider whether [appellant] is guilty under Count II of sexual abuse in the first degree thereby confusing and misleading the jury as to the range of punishment and type of punishment set forth in Instructions No. 8 and No. 9."

Appellant, as we understand him, argues that the jurors could have believed they could consider the lesser offense of sexual abuse in the first degree only if they decided not to "fine" him for sodomy. Appellant also argues that the jurors could have believed that if they found him guilty of sodomy and assessed his punishment at imprisonment, but no fine, they could also find him guilty of sexual abuse in the first degree under instruction 9.

The ultimate test of accuracy for an instruction is whether it precisely follows substantive law and whether it will be correctly understood by a jury composed of average lay people. *State v. Crews,* 585 S.W.2d 131, 134 (Mo.App.1979).

In considering appellant's point IV, we note that the verdict-directing instruction on sodomy (instruction 8) gave the jury no authority to "fine" appellant if it found him guilty of sodomy. Instruction 8 said, in pertinent part: "If you do find the defendant guilty under Count II of sodomy, you will assess and declare the punishment at imprisonment for a term of years fixed by you but not less than five years and not to exceed fifteen years." There was, therefore, no basis for the jury to "fine" appellant if the jury found him guilty of sodomy.

We also note that the phrases "if you find," "you will find," "if you do not find," "you must find," and "if you do find" appear in instruction 8, and all of those phrases appear again in instruction 9. It should have thus been evident to the jurors that instruction 8 and instruction 9 were given for the purpose of telling them what their verdict under Count II should be, depending on what they found and believed, and what they did not find and believe. Given the context in which the word "fine" appeared in the first paragraph of instruction 9, we are convinced that a jury of average lay people would have understood that the issue whether appellant was guilty of sexual abuse in the first degree was to be considered only if the jury failed to find him guilty of sodomy as submitted in instruction 8.

Furthermore, there can be no reversible error in the giving of an instruction on a lesser grade of an offense when the jury has found the accused guilty of a higher grade of that offense, unless an error exists in the former instruction which prevents the jury from convicting on the lesser grade. *State v. McIlvoy,* 629 S.W.2d 333, 338–39[8] (Mo. banc 1982); *State v. Kinnard,* 671 S.W.2d 336, 338[2] (Mo.App. 1984). We find no such error in instruction 9.

Point IV is denied, and the judgments[6] are affirmed.

GREENE, P.J., and A.J. SEIER, Special Judge, concur.

TITUS, J., not participating.

6. Appeal number 14433 is from the judgment in CR584–383FX, the 5-year sentence for sexual abuse in the first degree; appeal number 14434 is from the judgment in CR584–384FX, the 15-year sentence for sodomy.